**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
            *Plaintiff-Appellee,*

v.

JOHN WILLIAM STINSON, aka; Seal
C; Youngster; The Youngest,
            *Defendant-Appellant.*

No. 07-50408

D.C. No.
CR-02-00938-RGK

UNITED STATES OF AMERICA
            *Plaintiff-Appellee,*

v.

ROBERT LEE GRIFFIN, aka Seal E,
Blinky, McGrif, McGriff,
            *Defendant-Appellant.*

No. 07-50409

D.C. No.
CR-02-00938-
RGK-5

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
March 8, 2011—Pasadena, California

Filed August 5, 2011

Before: Pamela Ann Rymer, Consuelo M. Callahan, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Rymer

10269

## COUNSEL

Paul E. Potter, Esq., Pasadena, California, for appellant Stinson.

Joseph F. Walsh, Esq., Los Angeles, California, for appellant Griffin.

Shannon P. Ryan, Anne M. Voigts, Stephen G. Wolfe, Assistant United States Attorneys, Los Angeles, California, for the appellee.

## OPINION

RYMER, Circuit Judge:

John Stinson and Robert Griffin appeal their convictions for RICO conspiracy, 18 U.S.C. § 1962(d), for operating the Aryan Brotherhood (AB) prison gang. Stinson also appeals his conviction for violent crime in aid of racketeering (VICAR), 18 U.S.C. § 1959(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

The AB started in 1964 as a group of white prison inmates who asserted the need to protect themselves and later evolved into an organization designed to traffic narcotics across numerous California and federal prisons. In the early 1980s, the California AB was reorganized such that it was governed by a three-member commission. The commission had final say on AB orders to kill, orders to enforce AB rules, and the AB's business efforts. Griffin was an original member of the commission. By 1990, Stinson had joined Griffin on the commission.

A federal grand jury indicted Griffin and Stinson for operating a RICO conspiracy in violation of 18 U.S.C. § 1962(d) and for two counts of VICAR in violation of 18 U.S.C. § 1959(a)(1). The RICO count set forth numerous overt acts in furtherance of the conspiracy, including operating the California Commission and 11 murders, attempted murders, or conspiracies to murder. The VICAR counts alleged the murders of Arthur Ruffo and Aaron Marsh for the purpose of maintaining or increasing Griffin and Stinson's positions in the AB.

The case proceeded to a 27-day jury trial. The jury found Stinson and Griffin guilty of the RICO count and Stinson guilty of the VICAR counts. As for Griffin, the jury returned

special verdicts finding him guilty of all the charged overt acts of murder, attempted murder, or conspiracy to murder, except the murder of Marsh and the attempt and conspiracy to murder Jeffrey Barnett. The jury returned a special verdict finding that Griffin had not withdrawn from the conspiracy prior to the running of the statute of limitations on August 28, 1997. As for Stinson, the jury returned special verdicts finding him guilty of the same overt acts as Griffin, plus the Marsh murder. The jury also found Stinson guilty of VICAR for aiding, abetting, and conspiring to murder Ruffo and Marsh.

Stinson and Griffin were sentenced to life terms on the RICO count. Stinson was sentenced to additional life terms for the VICAR counts. Stinson and Griffin timely appeal.

## II

This appeal centers on numerous procedural decisions by the district court before and during the trial.

## A

Stinson and Griffin moved for dismissal of the VICAR counts on the basis that venue was improper in the Central District of California because the alleged murders occurred at the Pelican Bay State Prison in the Northern District of California. The district court denied the motion, reasoning that the VICAR counts charged offenses that continued into the Central District.

In claims for improper venue in criminal cases, "the underlying legal basis is reviewed de novo, [though] a district court's ruling on a motion for change of venue is reviewed for abuse of discretion." *United States v. Valdez-Santos*, 457 F.3d 1044, 1046 (9th Cir. 2006). On such a pre-trial motion to dismiss, courts presume the truth of the allegations in the indict-

ment. *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996).

**[1]** Under 18 U.S.C. § 3237(a), continuing offenses, defined as offenses "begun in one district and completed in another, or committed in more than one district," may be prosecuted "in any district in which such offense was begun, continued, or completed." Venue is proper under § 3237 when an "essential conduct element" of the offense continues into the charging district. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280-82 (1999). Venue is not proper when all that occurred in the charging district was a "circumstance element . . . [that] occurred after the fact of an offense begun and completed by others." *Id.* at 280 n. 4 (quoting *United States v. Cabrales*, 524 U.S. 1, 7 (1998)) (internal quotation marks omitted). We have instructed that "[c]rimes that are not unitary but instead span space and time . . . may be considered continuing offenses." *United States v. Pace*, 314 F.3d 344, 350 (9th Cir. 2002) (quoting *United States v. Corona*, 34 F.3d 876, 879 (9th Cir. 1994)) (internal quotation marks omitted); *see also United States v. Barnard*, 490 F.2d 907, 911 (9th Cir. 1973).

**[2]** We have not yet squarely reached the question of whether VICAR can be a continuing offense under § 3237. In answering that question, "a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279. As for the first step, we have already identified four elements of a VICAR conviction:

> (1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendant committed a violent crime; and (4) that the defendant acted for the purpose of promoting his position in a racketeering enterprise.

*United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008) (quoting *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir. 1995) (alterations omitted). As for the second step, "essential conduct elements" occurred in the Central District of California in addition to the Northern District of California. While the physical killing of Ruffo and Marsh occurred in the Northern District, the indictment charged that Stinson, "within the Central District of California" did "aid, abet, advice, encourage, and otherwise participate in the murder of Arthur Ruffo . . . [and] Aaron Marsh." The indictment therefore charged that the essential conduct element of committing a violent crime continued in the Central District. VICAR is consequently a continuing offense in this case. As a result, venue was proper in the Central District under 18 U.S.C. § 3237(a). The district court did not err in denying the motion to dismiss for improper venue.

B

Griffin moved to sever his case from Stinson's under Fed. R. Crim. P. 14 on the ground that he would be prejudiced by allegations against Stinson that do not apply to him. The district court denied severance. The court also issued limiting instructions to the jury that "you must decide the case for each defendant on each charge against that defendant separately."

We review a denial of a motion for severance under Rule 14 for an abuse of discretion. *United States v. Sullivan*, 522 F.3d 967, 981 (9th Cir. 2008).

**[3]** Rule 14 provides that "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant," then "the court may . . . sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Severance is appropriate under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United*

*States*, 506 U.S. 534, 539 (1993). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Id.* at 537.

**[4]** Griffin does not identify a "specific trial right" that was compromised by his joint trial. He argues that the district court's decision not to sever prejudiced him, because Stinson asked questions of a government agent that led to improper "vouching testimony" that was harmful to Griffin. Yet that is an objection to the admission of that testimony, which we address in subpart H, not to the court's decision not to sever. Any difference in trial strategy between Griffin and Stinson was not analogous to cases in which co-defendants seek to present mutually exclusive defenses, such that severance is a prerequisite to the defendants' due process right to mount a defense. *See, e.g., United States v. Mayfield*, 189 F.3d 895, 899-900 (9th Cir. 1999).

Nor may Griffin show that the joint trial "prevent[ed] the jury from making a reliable judgment about guilt or innocence" in light of the district court's instruction. *Zafiro*, 506 U.S. at 539. Where "the district court uses great diligence in instructing the jury to separate the evidence, severance is unnecessary because the prejudicial effects of the evidence of codefendants are neutralized." *United States v. Patterson*, 819 F.2d 1495, 1503 (9th Cir. 1987) (footnote and internal quotation marks omitted). *See also United States v. Fernandez*, 388 F.3d 1199, 1242-43 (9th Cir. 2004). The district court explicitly instructed the jury that it "must decide the case for each defendant on each charge against that defendant separately." It is clear that the jury was able to compartmentalize the evidence because it returned different verdicts with regard to Griffin and Stinson on the overt act of the murder of Marsh. "[T]he fact that the jury rendered selective verdicts is highly indicative of its ability to compartmentalize the evidence." *United States v. Lazarenko*, 564 F.3d 1026, 1043 (9th Cir. 2009) (quoting *United States v. Cuozzo*, 962 F.2d 945, 950 (9th Cir. 1992)) (internal quotation marks omitted). As a

result, the district court did not abuse its discretion in denying Griffin's motion to sever.

## C

The government originally sought the death penalty against Stinson and Griffin and consequently sought to "death qualify" the jury by excluding those who would automatically vote against the death penalty because of their opposition to capital punishment. Griffin filed a motion objecting to death qualification on the footing that it violated his Sixth Amendment right to an impartial jury selected from a representative cross section of the community. The district court denied the motion, and the jury was death qualified. The government subsequently withdrew its intent to seek the death penalty.

We review "independently and non-deferentially" challenges to the composition of a jury based on the Sixth Amendment's guarantee of a fair and impartial jury. *United States v. Sanchez-Lopez*, 879 F.2d 541, 546 (9th Cir. 1989).

**[5]** The Supreme Court has made clear that death qualifying a jury in a capital case does not violate the Sixth Amendment's impartial jury or fair cross section requirements. *Lockhart v. McCree*, 476 U.S. 162, 174, 184 (1986). The Court has similarly found no Sixth Amendment violation in death qualifying a jury even when a non-capital defendant is tried jointly with a capital defendant. *Buchanan v. Kentucky*, 483 U.S. 402, 420 (1987).

**[6]** We have since applied *McCree* and *Buchanan* in a habeas case to hold that the use of a death qualified jury in what the state supreme court held should have been a non-capital case was not a clear due process violation. *Furman v. Wood*, 190 F.3d 1002, 1004-05 (9th Cir. 1999). In *Furman*, we explicitly rejected the argument that *Buchanan* was limited to cases in which non-capital defendants are tried jointly with capital defendants. *Id.* at 1005. In light of *Furman*, there

was no Sixth Amendment violation here. The district court did not err in proceeding with a death qualified jury.[1]

D

During jury selection, the district court rejected two *Batson* challenges by Stinson and Griffin. Their first challenge was to a government peremptory strike of a female potential juror, number 78. The district court overruled the objection, reasoning that number 78 had mentioned that she wanted to get off the case twice. The judge explained that he therefore could see the government not being satisfied with her. After the court denied the *Batson* challenge, the government indicated that it was challenging number 78 so as not to anger her.

During the selection of alternates, the government used a peremptory on potential alternate number 101, also a woman. Griffin and Stinson raised a second *Batson* challenge on the ground that the prosecution was systematically removing women from the jury. The government responded that number 101 had a nephew who spent many years in prison for robbery and was familiar with the gangs on a personal basis. The district court overruled the objection based on the years of imprisonment of the nephew and the connection with the gangs. The court noted that of the six people who were then the alternates, there were three men and three women.

The government later challenged potential alternate number 118 for cause on the basis that she was hesitant when she talked about her boyfriend's incarceration and seemed biased with respect to the penal system. The district court denied that challenge. The government then sought to remove the juror with a peremptory challenge. Stinson and Griffin again raised

---

[1]The argument that VICAR is not an offense eligible for the death penalty under the Federal Death Penalty Act, 18 U.S.C. § 3591, is contrary to our precedent. *United States v. Fernandez*, 231 F.3d 1240, 1242-43 (9th Cir. 2000).

*Batson* for systematic exclusion of women. This time, the court sustained the objection, reasoning that it was not impressed with number 118 having any problems.

In *Batson* challenges to discriminatory peremptory strikes, district court determinations of whether a prima facie showing of discrimination has been made are reviewed for clear error. *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en banc). The same applies to determinations of whether purposeful discrimination has been shown. *Hernandez v. New York*, 500 U.S. 352, 369 (1991) (plurality). If the district court applies the wrong legal standard, however, we review the claim *de novo*. *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004).

The Equal Protection Clause prohibits discrimination in jury selection on the basis of gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994). In order to challenge such discrimination:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of gender. Second, if that showing has been made, the prosecution must offer a gender-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*United States v. Alanis*, 335 F.3d 965, 967 (9th Cir. 2003) (internal brackets omitted).

Under this framework, the district court did not clearly err. Regarding potential juror 78, the district court appears to have concluded that Stinson and Griffin did not meet the first requirement of making a prima facie showing of discrimination, as the court denied their request without seeking a response from the government. The record supports this conclusion. Number 78 had asked several times not to be selected

because of a personal conflict. This led the judge independently to suggest that she be excused. While the government had previously challenged four women, it had also challenged two men. Considering the totality of the relevant facts, the record suggests that number 78 was stricken because of her insistence that she did not want to serve, not because of her gender.

**[7]** Regarding potential alternate 101, the district court appears to have concluded that Griffin and Stinson made a prima facie showing, as it went on to call for a response from the government. At the second step, the government offered a gender neutral explanation: her nephew's long time in prison and her personal familiarity with gangs. At the third step, the court accepted that explanation and did not find purposeful discrimination. At root, this was a credibility determination that the district court was in the best position to make. *Hernandez*, 500 U.S. at 365. Furthermore, the proffered explanation appears credible because the government had not challenged the previous three female alternates.

Regarding potential alternate 118, Stinson and Griffin were not harmed because the district court did not excuse her. In sum, the district court did not clearly err in rejecting the two *Batson* challenges.

E

Stinson served a subpoena on the California Department of Corrections and Rehabilitation (CDCR) for the confidential file that the CDCR kept on him. The district court ordered the CDCR to produce Stinson's confidential file in unredacted form to the government and ordered the government to redact any sensitive information in order to protect the safety and security of witnesses. Stinson then filed two motions to compel discovery from the government of an unredacted version of the confidential file or, in the alternative, for the court to

review the redacted material *in camera* to determine what must remain redacted. The district court denied the motions.

We generally review asserted *Brady* violations *de novo*. *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1456 (9th Cir. 1993). Decisions concerning redactions or the production of specific information within a document are reviewed for clear error. *United States v. Si*, 343 F.3d 1116, 1122 (9th Cir. 2003); *United States v. Monroe*, 943 F.2d 1007, 1012 (9th Cir. 1991).

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are three components of a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "To determine whether prejudice exists, we look to the materiality of the suppressed evidence." *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008). When looking to materiality, the question is "whether admission of the suppressed evidence would have created a reasonable probability of a different result," so the defendant "must show only that the government's evidentiary suppression undermines confidence in the outcome of the trial." *United States v. Jernigan*, 492 F.3d 1050, 1053-54 (9th Cir. 2007) (en banc) (internal citation and quotation marks omitted).

[8] Stinson has not shown that the redacted documents constituted a *Brady* violation. The documents referenced are debriefing interviews of inmates who did not testify at trial, so the redacted identities of the debriefers were not material, let alone exculpatory or impeaching. Nor is Stinson able to show a "reasonable probability of a different result" by specu-

lating about what might have been redacted. *Jernigan*, 492 F.3d at 1053-54. A district court need not make such documents available based on "mere speculation about materials in the government's files." *United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir. 2009) (quoting *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986)) (internal quotation marks omitted).

**[9]** Neither does Stinson show that the district court erred in not reviewing an unredacted version of the documents *in camera*. In *United States v. Alvarez*, 86 F.3d 901, 906-07 (9th Cir. 1996), we discussed the Jencks Act's requirement that the government produce any statement of a witness that relates to his testimony. We recognized that, under the Jencks Act, when the United States claims that a statement ordered to be produced does not relate to the testimony of a witness, "the court shall order the United States to deliver such statement for the inspection of the court in camera" and "the court shall excise the portions of such statement which do not relate." *Id.* at 907 (quoting 18 U.S.C. § 3500(c)). In this case, however, the redaction procedure discussed in *Alvarez* does not apply because none of the redactions at issue concerned statements of testifying witnesses. We therefore conclude that the district court did not err in supervising discovery because the government did not redact *Brady* material and the court was not required to review unredacted documents *in camera*.

F

Government witness Clifford Smith admitted on direct and cross-examination that he had previously perjured himself, including in a related trial against other members of the AB. Smith also testified that he had received a total of $1,000 to $1,500 for his testimony over the past four or five years from a federal agent, Michael Halualani, including payments after his perjury in the related AB case. Government witness Brian Healy testified on cross-examination that agent Halualani had made him feel threatened that he could be indicted and get the

death penalty if he did not cooperate. Halualani later testified that he probably did threaten Healy in that way. Government witness David Griffin testified on cross-examination that a California corrections officer threatened to send him to solitary confinement if he did not produce information about defendant Robert Griffin.

Griffin and Stinson moved the district court to dismiss the indictment for extreme and outrageous conduct and under the court's supervisory powers, citing the government's conduct with regard to these three witnesses. Stinson moved to suppress their testimony. The district court denied both motions. The court subsequently instructed the jury that it could consider a witness's previous acts of perjury in deciding whether or not to believe that witness.

We review *de novo* a district court's denial of a motion to dismiss an indictment due to outrageous government conduct. *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003). A district court's decision not to use its supervisory powers to dismiss an indictment is reviewed only for abuse of discretion. *Id.* We review denials of motions to suppress *de novo*. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc).

In order to show outrageous government conduct, defendants must show conduct that violates due process in such a way that it is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (quoting *United States v. O'Connor*, 737 F.2d 814, 817 (9th Cir. 1984)) (internal quotation marks omitted). The defense is therefore "limited to extreme cases in which the government's conduct violates fundamental fairness." *Gurolla*, 333 F.3d at 950.

**[10]** The government's conduct with regard to Smith does not meet this standard. We are unaware of any case in which we have dismissed an indictment for similar witness compen-

sation or for the testimony of a witness with a history of perjuring himself. We have upheld much greater compensation. *United States v. Cuellar*, 96 F.3d 1179, 1182 (9th Cir. 1996). As for the witness's history of perjury, the jury was made aware of this history on direct and cross-examination and was free to weigh the testimony accordingly. The court explicitly instructed the jury that it could consider previous acts of perjury in deciding whether or not to believe a witness. This is not a case in which the credibility of a witness came into question only after the trial or in which the government knowingly introduced false testimony. *See, e.g., Mesarosh v. United States*, 352 U.S. 1 (1956); *Napue v. Illinois*, 360 U.S. 264 (1959). In light of the "traditional safeguards" of disclosure to the jury on cross-examination and the jury instruction, the government's conduct regarding Smith was not outrageous. *Cuellar*, 96 F.3d at 1183.

**[11]** Nor was the government's conduct with regard to Healy and David Griffin outrageous. We have upheld similar pressure by the government to secure witness cooperation. *United States v. Ryan*, 548 F.2d 782, 788-89 (9th Cir. 1976); *see also United States v. Dudden*, 65 F.3d 1461, 1466 (9th Cir. 1995). Accordingly, the government's conduct did not rise to the level of coercion. *See, e.g., Hysler v. Florida*, 315 U.S. 411 (1942). The government's conduct with regard to these witnesses was thus not "so grossly shocking and so outrageous as to violate the universal sense of justice." *Restrepo*, 930 F.2d at 712.

Even if the conduct did not rise to the level of a due process violation, the court could have nonetheless dismissed the indictment under its supervisory powers. *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991). Such a power may be exercised "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *Id.* The power is not strictly limited to those uses. *United States v. W.R. Grace*, 526

F.3d 499, 511 n. 9 (9th Cir. 2008) (en banc). Here, as we have explained, there was no constitutional violation or illegal conduct to be deterred. Nor was judicial integrity at risk, as cross-examination and jury instructions addressed concerns about witness credibility.

[12] We therefore conclude that the district court did not err in denying the motion to dismiss for outrageous government conduct or under its supervisory powers. Because there was no constitutional or other violation, the district court similarly did not err in denying the motion to suppress.

## G

In 2006, a different district court granted Griffin's writ of habeas corpus, which asserted that his indefinite confinement in a segregated housing unit unless he would debrief the government about the AB violated the Eighth Amendment. That court reasoned that Griffin's confinement for what was by then 20 years had vitiated his active gang participation and rendered insignificant any information he still had about the AB.

In this case, defense expert witness Robert Ayers testified that Griffin was inactive in the AB, at least as of 1997. After cross-examination, Griffin sought to rehabilitate the witness by introducing the habeas order to ask Ayers what effect it had on his opinion of Griffin's withdrawal. The district court ruled that the order was not admissible.

We review a district court's evidentiary rulings for abuse of discretion. *Tritchler v. County of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004). This includes the exclusion of evidence under a hearsay rule. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).

A prior judgment is "hearsay to the extent that it is offered to prove the truth of the matters asserted in the judgment," but

is "not hearsay, [ ] to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties." *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir. 2004). In *Boulware*, we held that a prior judgment determining the ownership of assets was not hearsay in a tax prosecution to the extent it was offered not for its truth but merely to establish its legal effect. *Id.* at 806-807. On the other hand, in *United States v. Sine*, 493 F.3d 1021, 1036-37 (9th Cir. 2007), we held that a prior court order was hearsay when findings from the order were used to cross-examine a witness, since the purpose was for the jury to agree with the prior judge's findings.

[13] In this case, the order granting the habeas petition was inadmissible hearsay because it was offered for its truth, as in *Sine*. Griffin sought to reinforce Ayers's testimony by introducing the habeas order that reached a similar conclusion as Ayers. He implied this purpose when he told the court he would show it to Ayers and ask him what effect that has on his opinion. This indicates that the order was offered for its truth, specifically so that the jury would agree with the prior judge's conclusions which corroborated Ayers's testimony. The order was not being offered merely to establish its legal effect, i.e. that Griffin had a legal right to be released from segregated housing as of the date of the order. The district court therefore did not abuse its discretion in excluding the order.[2]

## H

During trial, Stinson called government investigator Halualani to testify concerning the background of government informant—witnesses Smith, Harper, Roach, and Healy. Stin-

---

[2]Nor is the order admissible under Fed. R. Evid. 703. That rule concerns the "facts or data in the particular case upon which an expert bases an opinion or inference." Fed. R. Evid. 703. The order was not a basis for Ayers's opinion.

son elicited testimony that Halualani was aware of prior perjury by Smith but had still paid him for his testimony because he did not deem him unreliable at the time. Stinson also asked what if anything Halualani had done to verify Harper's prior statement that he heard Stinson order Healy to murder Ruffo. Finally, Stinson elicited testimony suggesting that Roach and Healy could have fabricated their stories with other informants housed in the same unit.

Before cross-examination, Stinson and Griffin raised with the court their concern that the government on cross-examination would try to use Halualani to vouch for the credibility of Smith, Harper, Roach, and Healy. The district court responded that the "door [h]as been opened" to questions like "if you say that some of these informants . . . are unreliable why do you use them," but the government could not ask "whether or not . . . these three witnesses are believable."

On cross-examination, the government asked Halualani about his use of the four informants. Regarding Smith, the government asked Halualani why he had continued to pay Smith after his prior perjury, to which Halualani responded, "I still found him to be reliable about the things he had testified about concerning the Aryan Brotherhood." Regarding Harper, the government elicited that Halualani determined that Harper had not lied to him by reviewing prison records and based on Harper's knowledge as well as letters and meetings between AB members and Harper. Regarding Roach and Healy, the government asked how Halualani countered concerns that they had fabricated testimony in a certain unit, to which Halualani responded that both had been debriefed before entering that unit. He also testified that information corroborated 99 percent of what Roach had said, and that Healy's statements seemed reliable because they were against his interests.

Griffin and Stinson objected to this testimony as vouching and moved to strike, but the district court overruled the objec-

tions. The district court also denied Griffin and Stinson's motion for a new trial based on the alleged vouching.

We review alleged vouching for harmless error when, as here, the defendant objected at trial. *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002). We review for abuse of discretion a district court's rulings on alleged prosecutorial misconduct, including vouching. *United States v. Sarkisian*, 197 F.3d 966, 988 (9th Cir. 1999).

"Improper vouching occurs when the prosecutor places the prestige of the government behind the witness by providing personal assurances of the witness's veracity. Improper vouching also occurs where the prosecutor suggests that the testimony of government witnesses is supported by information outside that presented to the jury." *United States v. Wright*, 625 F.3d 583, 610 (9th Cir. 2010) (internal citations and quotation marks omitted). "[P]rosecutorial misconduct may occur through the prosecutor's own vouching remarks or when the prosecutor elicits vouching testimony from witnesses." *Cheney v. Washington*, 614 F.3d 987, 996 n.4 (9th Cir. 2010). We have rejected the proposition that "whenever a defense counsel attacks the credibility of witnesses the prosecutor can respond with vouching statements." *United States v. Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir. 2005).

**[14]** We have previously concluded that it is not vouching when the government elicits testimony from a government agent about the *prior* reliability of an informant-witness after the defendant opens the door on direct examination. *United States v. Nobari*, 574 F.3d 1065, 1078 (9th Cir. 2009). In *Nobari*, the defendant called a government informant to testify and attempted to impeach him with alleged prior untruthfulness in violation of a prior plea agreement. We held that this "opened the door" so that questions by the prosecution to the informant about his prior truthfulness under that agreement would not be vouching. *Id*. We also held that it was not vouching for the government then to elicit testimony from a

government agent about whether that informant had proven reliable and truthful in his daily contacts with agent. *Id*. On the other hand, we have rejected the testimony of government agents as vouching when it addresses an informant-witness's *present* credibility in the case. *United States v. Rudberg*, 122 F.3d 1199, 1204 (9th Cir. 1997).

[15] Applying these cases, the testimony elicited from Halualani regarding Smith and Harper was not vouching. Halualani testified that he paid Smith after past perjury because he still found him reliable *at that time*. Similarly with Harper, Halualani limited his testimony entirely to whether Harper had lied to him during his investigation and what steps he took in the past to confirm that. As in *Nobari*, nowhere did his testimony address the credibility of the trial testimony of Smith and Harper.

With regard to Roach and Healy, the government elicited vouching testimony only to the extent that Halualani referred to the corroboration of statements and evidence used in this trial. Regardless, we do not reverse on the basis of vouching if the error was harmless. *Sarkisian*, 197 F.3d at 990. "In applying a harmless error analysis in the context of vouching, we must determine whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial." *Hermanek*, 289 F.3d at 1102. When a small amount of vouching occurs in the context of a large trial and strong government case, we have found the error harmless. *See Wright*, 625 F.3d at 613 (vouching statements were harmless because they "were relatively isolated incidents over the course of a ten day trial"); *Hermanek*, 289 F.3d at 1102; *Sarkisian*, 197 F.3d at 990.

Even assuming that vouching occurred, it is unlikely that the vouching materially affected the fairness of the trial because the government put forward a significant amount of evidence of a RICO conspiracy and VICAR. Any vouching for Roach and Healy occupies only six pages in the record of

a trial in which the government put on 29 witnesses over at least 15 days of testimony in its case in chief. Ruffo's killer testified that he killed Ruffo on behalf of Griffin and Stinson and that another AB member killed Marsh for them. Documentary evidence of the RICO conspiracy included a letter from Stinson and Griffin describing the AB's strategy against other gangs and justifying and planning murders. Another document described the organization of the AB to pursue criminal activities. The government admitted in evidence a letter from Griffin acknowledging that he had been a member of the AB Commission prior to 1985. The government also admitted receipts of documents exchanged among Griffin, Stinson, and other AB members in 1993 and 1994.

[16] The government also put forward a large quantity of evidence that Griffin did not withdraw from the AB prior to the 1997 date relevant to the statute of limitations, so any vouching was harmless with respect to this defense as well. As explained, Harper's testimony was not vouched for, and he linked Griffin to the AB during the Marsh murder, which was just before the 1997 date. David Griffin testified that defendant Robert Griffin offered to help him join the AB in 1999. Corroborating the testimony that Griffin had not withdrawn before 1997, the government introduced documentary evidence including: a sham pleading from 1999 discussing the AB's business efforts that indicated it was to be sent to Griffin; 2001 and 2002 AB membership lists showing Griffin still in the AB; a 2002 postcard to Griffin from an AB member; and pen register data showing numerous calls in 1998 and 1999 between the place where Griffin was housed and another AB member. The strength of this documentary evidence in combination with the testimony of Harper and David Griffin rendered any vouching harmless to Griffin's withdrawal defense. We therefore conclude that even if the government elicited vouching testimony, it was harmless in light of the strength of its case.

# I

Griffin called as an expert witness Robert Ayers, a warden at the Pelican Bay state prison while Griffin was housed there. He testified that, in 1997 or 1998, he read Griffin's confidential file and had an investigation conducted into whether Griffin was still active in the AB. Ayers testified that his opinion from that investigation was that Griffin was no longer active in the AB.

On cross-examination, the government posed a series of hypotheticals about whether Ayers's opinion would be different if there were more recent evidence in Griffin's confidential file showing AB activity. Some of these hypotheticals concerned matters for which evidence was introduced at trial. Others concerned redacted inmate debriefings not in evidence, though the government later unsuccessfully attempted to introduce them. Others concerned matters that were never introduced in evidence nor even disclosed to Griffin and Stinson. At the end of cross-examination, the government told Ayers that a defense attorney "didn't share any of that stuff with you."

The district court told the jury that "if the underlying facts of a hypothetical question are not proved in court then the opinion has no meaning . . . you are not to assume any of this happened unless it's proved later." In addition to this admonition to the jury during cross-examination, the district court at the close of evidence instructed the jury: "Questions were asked of the witness Robert Ayers on cross-examination about documents he had not seen. In light of the fact that the questions are not evidence, you are to disregard such questions and answers given concerning any documents obviously that he had not read or seen." The court also more generally instructed that "[q]uestions and objections of the lawyers are not evidence."

Partly on the basis of this cross-examination, Griffin and Stinson moved for a new trial, which the district court denied.

We review alleged prosecutorial misconduct for harmless error when, as here, the defense objected at trial. *Wright*, 625 F.3d at 610. We review for abuse of discretion a district court's rulings on alleged prosecutorial misconduct. *Sarkisian*, 197 F.3d at 988.

"It is improper under the guise of artful cross-examination, to tell the jury the substance of inadmissible evidence." *United States v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999) (quotations omitted). Experts may be asked hypothetical questions on cross-examination, but such questions "must not require the expert to assume facts that are not in evidence." *Taylor v. Burlington Northern R. Co.*, 787 F.2d 1309, 1317-18 (9th Cir. 1986). "[P]roceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means." Fed. R. Evid. 103(c)

**[17]** All the hypotheticals based on debriefs not admitted in evidence told the jury the substance of inadmissible hearsay. The debriefs were out of court statements offered for their truth—that Griffin had, for example, recently ordered a hit on the so-called Black Dragon Rapist, and therefore had not withdrawn from the AB. The debriefs were not suggested merely to show that documents existed that Ayers had not seen, because the government had already established that Ayers had not seen documents added to Griffin's confidential file after 1998. Nor could the debriefs be disclosed under Fed. R. Evid. 703 or 705, as they were explicitly not the basis of Ayers's opinion. We therefore conclude that it was prosecutorial misconduct to pose questions or hypotheticals to Ayers concerning debriefs that were not admitted in evidence.

However, we do not reverse for prosecutorial misconduct if it is harmless. *Wright*, 625 F.3d at 610. The inquiry is "whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial." *Hermanek*, 289 F.3d at 1102. "To determine whether the prosecu-

tor's misconduct affected the jury's verdict, we look first to the substance of a curative instruction. . . . Another important factor contributing to the prejudicial effect of improper statements is the strength of the case against a defendant." *Weatherspoon*, 410 F.3d at 1151.

As for the first factor, the district court offered a curative instruction that "you are to disregard such questions and answers given concerning any documents obviously that [Ayers] had not read or seen." The court also instructed that "[q]uestions and objections of the lawyers are not evidence." It further warned the jury during the cross-examination that "you are not to assume any of this happened unless it's proved later." As we have observed, "juries are assumed to follow the court's instructions." *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1030 (9th Cir. 2009). As for the second factor, as we have explained, the government had a strong case that Griffin had not withdrawn from the AB.

**[18]** We have found misconduct similar to that in this case to be harmless in light of such jury instructions and strong evidence. *United States v. Schindler*, 614 F.2d 227, 228 (9th Cir. 1980); *see also Sarkisian*, 197 F.3d at 988 (1999). The government's case was strong enough that the cumulative effect of the misconduct and the minimal vouching was still harmless. As a result, we conclude that the prosecutorial misconduct in posing hypotheticals concerning debriefs not in evidence was harmless in light of jury instructions and an otherwise strong government case.

J

In light of the cross-examination of Ayers, Griffin requested that the district court instruct the jury that:

> [G]overnment's counsel Mark Aveis implied that defense counsel had not provided Mr. Ayers with the entire confidential file. . . . [D]efense counsel pro-

vided Robert Ayers with all of the confidential documents and debriefings that defense counsel had received from the government. Therefore, you should not consider the fact that Warden Robert Ayes did not read all of the documents and debriefings in Robert Griffin's confidential file as a factor that in any way lessens the persuasiveness of his expert testimony.

The district court denied the request. The court did, however, instruct the jury that:

Questions were asked of the witness Robert Ayers on cross-examination about documents he had not seen. In light of the fact that the questions are not evidence, you are to disregard such questions and answers given concerning any documents obviously that he had not read or seen.

The government proposed a jury instruction that acts intended to conceal a conspiracy may be in furtherance of the conspiracy's goals. In response to Griffin's objection, the district court modified the instruction and ultimately instructed the jury that "acts intended to conceal or cover up the existence of the conspiracy *may or may not* be in furtherance of the conspiracy's aims or goals."

The standard of review for a district court's denial of a proposed jury instruction "turns on the nature of the error alleged." *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997). "We review *de novo* whether the district court's instructions adequately presented the defendant's theory of the case," but "we review the instruction's 'precise formulation' for an abuse of discretion." *Id.* (quoting *United States v. Woodley*, 9 F.3d 774, 780 (9th Cir. 1993).

With respect to the instruction on Ayers, assuming the government improperly implied that the defense concealed docu-

ments from Ayers, the instruction the district court gave addresses it. Any such implication arose from the hypotheticals about documents not in evidence and asking Ayers why the defense "didn't share any of that stuff with you." However, the district court instructed the jury to "disregard such questions and answers given concerning any documents obviously that he had not read or seen." When the jury accordingly disregarded the government's questions, it was not able to draw inferences about defense counsel from those questions. The instruction given therefore addressed any improper inference.

As for the instruction on acts intended to conceal, the district court's instruction was a correct statement of the law under *Grunewald v. United States*, 353 U.S. 391 (1957). The Court in *Grunewald* held that "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Id.* at 405. Depending on the scope of the alleged conspiracy, we have since noted that concealment may or may not be in furtherance of the conspiracy. *Compare United States. v. Finlay*, 55 F.3d 1410, 1415 (9th Cir. 1995) (in furtherance), *with United States v. Green*, 594 F.2d 1227, 1229 (9th Cir. 1979) (potentially not in furtherance).

**[19]** In this case, the conspiracy as charged specifically includes the "attempt to conceal from law enforcement the existence of the Aryan Brotherhood, the identity of its participants, and the ways in which it conducts its affairs." This case therefore fits neatly into the *Grunewald* category of cases concerning "acts of concealment done in furtherance of the main criminal objectives of the conspiracy." *Grunewald*, 353 U.S. at 405. As a result, the district court's instruction was entirely consistent with *Grunewald*, as it properly gave the jury latitude to interpret recent acts of concealment as acts in furtherance that defeat Griffin's withdrawal defense. We

therefore conclude that the district court did not err in its jury instructions.

## K

During the trial, Ricky Rose, a potential government witness who was never called, left the courthouse and said "they're not guilty" in the presence of two jurors. In response, the district court interviewed those jurors, telling them that "the people that approached you are not parties to this case" and asking "whether or not their having any contact with you would have any effect on your deliberations." The jurors indicated that the contact would not affect their deliberations. Griffin requested that the court instruct the jurors that Rose was a government witness. The court denied the request.

"We review alleged jury misconduct independently, in the context of the entire record" but "accord substantial weight to the trial judge's conclusion as to the effect of alleged juror misconduct." *United States v. Madrid*, 842 F.2d 1090, 1092 (9th Cir. 1988).

"When there has been improper contact with a juror or any form of jury tampering-whether direct or indirect-we apply a presumption of prejudice." *United States v. Simtob*, 485 F.3d 1058, 1064 (9th Cir. 2007) (citing, e.g., *Remmer v. United States*, 347 U.S. 227, 229 (1954). "[T]he presumption of prejudice applies when the unauthorized conduct or contact is possibly prejudicial." *United States v. Rutherford*, 371 F.3d 634, 642 (9th Cir. 2004).

We have affirmed convictions despite improper contact with a juror when the district court held a hearing and determined that there was no prejudice. *United States v. Elias,* 269 F.3d 1003, 1019-20 (9th Cir. 2001). By contrast, courts have expressed concern about prejudice when district courts fail to interview jurors to evaluate prejudice after discovering the contact. *Remmer*, 347 U.S. at 229; *Simtob*, 485 F.3d at 1064-

65; *United States v. Angulo*, 4 F.3d 843, 846-67 (9th Cir. 1993).

The district court's interview with the jurors was sufficient to overcome the presumption of prejudice. The district court interviewed both affected jurors and asked "is there anything about that contact that would affect your deliberations in this case?" The jurors answered that they weren't affected. The district court was satisfied with their answers, and the "trial judge is uniquely qualified to appraise the probable effect of information on the jury. . . . The judge's conclusion about the effect of the alleged juror misconduct deserves substantial weight." *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir. 1981).

[20] We see no reason why the judge would have needed specifically to instruct the jurors that Rose was a government witness to prevent juror bias. Any concern that jurors would assume Rose was affiliated with the defense was addressed by the instruction that "the people that approached you are not parties to this case." In light of the district court's instruction distancing Rose from both parties and the court's interview with the jurors to ensure a lack of prejudice, the district court did not err in declining to instruct the jurors that Rose had been a potential government witness.

L

During its deliberations, the jury requested that only portions of the testimony of four witnesses be read back to it, specifically their testimony concerning a murder and three attempted murders that were alleged overt acts. Stinson and Griffin objected to the reading of only parts of the testimony of these witnesses.

The district court allowed the partial read backs, which included those portions of the witnesses' direct and cross-examinations that pertained to the specified murders and

attempted murders. The testimony was read in open court. The court told the jury it could have any additional testimony read back. Yet the district court did not admonish the jury against unduly emphasizing the testimony that was read back. Defense counsel did not object to this lack of admonition.

"We review for abuse of discretion the 'decision to honor a request that the court reporter read his notes of certain testimony for the jury's benefit after deliberation has begun.' " *United States v. Sandoval*, 990 F.2d 481, 486 (9th Cir. 1993) (quoting *United States v. Birges*, 723 F.2d 666, 671 (9th Cir. 1984)). Under that standard, we will not reverse unless we have a "definite and firm conviction that the district court committed a clear error in judgment." *United States v. Richard*, 504 F.3d 1109, 1113 (9th Cir. 2007) (quoting *United States v. Hernandez*, 27 F.3d 1403, 1408 (9th Cir. 1994)) (internal quotation marks omitted). Failure to give an admonition against overemphasizing read back testimony is reviewed for plain error where, as here, the defendant does not object and "can lead to reversal only if prejudicial." *United States v. Newhoff*, 627 F.3d 1163, 1167 (9th Cir. 2010).

We recently addressed partial read backs of testimony in *Newhoff*, in which we summarized our prior cases and observed that:

> to avoid the inherent risk of undue emphasis from a readback: (1) preferably the readback or replay should take place in open court with all present; (2) the jury should ordinarily be provided with the witness's entire testimony, direct and cross-examination; and (3) the jury should be admonished to weigh all the evidence and not just one part.

*Id.* at 1168. In *Newhoff*, we held that the district court erred in reading back one witness's testimony without admonishing the jury not to give it undue emphasis. *Id.* at 1167-68. In *Richard*, we considered the read back of only a portion of a wit-

ness's testimony and found error where the district court required the jury to select only a portion of the witness's testimony and where that testimony was the core of the government's case. *Richard*, 504 F.3d 1113-15; *see also United States v. Hernandez*, 27 F.3d 1403, 1408-09 (9th Cir. 1994). *But see Sandoval*, 990 F.2d at 487 (partial read back was not an abuse of discretion in light of other precautions).

**[21]** Yet regardless of whether the district court erred in permitting the partial read backs without additional precautions, we would not reverse any such error unless it affected the defendant's substantial rights. *Newhoff*, 627 F.3d at 1169. In *Newhoff*, we declined to reverse the conviction, despite the district court's plain error in failing to admonish, because "several witnesses, not just the one whose testimony was read back, put Newhoff in possession of the pistol." *Id*. Similarly in this case, the read back testimony was only a small amount of the evidence showing Griffin and Stinson's involvement in the RICO conspiracy. We therefore conclude that the partial read backs of testimony without additional precautions such as an admonition did not affect Griffin and Stinson's substantial rights in light of other evidence presented and therefore do not warrant reversal.

## M

Griffin requested a special verdict form that asked the jury, "Did the government prove beyond a reasonable doubt that Defendant Robert Lee Griffin did not withdraw from the conspiracy charged in Count One before August 28, 1997?" The district court modified the verdict form to read, "Did Defendant Robert Lee Griffin withdraw from the conspiracy charged in Count 1 before August 28, 1997?" The district court also instructed the jury that "the government must prove beyond a reasonable doubt that the defendant did not withdraw from the conspiracy prior to August 28th, 1997." Griffin objected that the modified version of the special verdict form

"may imply to the jury that the defendant has some burden of proving the withdrawal." The court overruled the objection.

We treat verdict forms like jury instructions, *see United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998), the formulation of which we review for abuse of discretion, *see United States v. Shipsey*, 363 F.3d 962, 967 n.3 (9th Cir. 2004). Accordingly, we review a district court's formulation of a special verdict form for abuse of discretion.

**[22]** Nothing in the special verdict form creates the impression that the burden was on Griffin. The form simply does not address the burden of proof, and the court properly instructed the jury that the government bore the burden on this point. Juries are presumed to follow such instructions. *Cardenas-Mendoza*, 579 F.3d at 1030. As a result, we conclude that the district court operated well within its discretion when it chose the wording of the special verdict form on withdrawal.

### III

Accordingly, we affirm the convictions of Griffin and Stinson on the RICO count and Stinson's convictions on the VICAR counts.

AFFIRMED.