Opinion by Judge W. FLETCHER; Dissent by Judge NOONAN.
OPINION
W. FLETCHER, Circuit Judge:
In this appeal, we again address what constitutes “outrageous government conduct” in the context of a reverse sting operation.
I. Background
For several decades, the Bureau of Alcohol, Tobacco, and Firearms (“ATF”) has conducted reverse sting operations in order to identify and apprehend people who can be enticed into robbing fictitious drug “stash houses” (houses in which drugs are “stashed”). In these “stash house stings,” an undercover agent poses as a disgruntled drug courier with knowledge about a stash house protected by armed guards and containing a large amount of cocaine. The agent suggests to targets of the reverse sting that they join forces, rob the house, and split the proceeds. Once the targets have taken steps to rob the fictional house, they are arrested and charged with conspiracy to violate federal narcotics laws.
The defendant in this case, Alex Pedrin, Jr., was the target of a stash-house sting in Arizona in August 2009. The sting was planned by ATF agent Richard Zayas, at the time a 20-year veteran of the bureau. According to Zayas, he has planned “hundreds” of stash-house stings, beginning in Miami, Florida in the 1990s. See, e.g., United States v. Cortes, 757 F.3d 850, 855 (9th Cir.2014) (as amended) (noting Zayas’s involvement); United States v. Black, 733 F.3d 294, 298 (9th Cir.2013) (same); United States v. Docampo, 573 F.3d 1091, 1093 (11th Cir.2009) (same); United States v. Paisley, 178 Fed.Appx. 955, 957 (11th .Cir.2006) (same). “[T]he ATF has a standard playbook for such operations, and the facts between cases are frequently nearly identical.” United States v. Kindle, 698 F.3d 401, 404 (7th Cir.2012), rev’d en banc sub nom. United States v. Mayfield, 771 F.3d 417 (7th Cir.2014) (en banc).
Zayas met Pedrin through a confidential informant, Jesus Contreras. Contreras was working with Zayas in the ATF’s Tucson office. Contreras told Zayas that his nephew, Omar Perez, had called him to “ask[ ] for work,” which Contreras understood to mean work stealing drugs. Contreras set up a meeting between Za-yas, Perez, and Pedrin on August 17, 2009. The meeting took place in Zayas’s car. During a videorecorded conversation in the car, Zayas described himself to Perez and Pedrin as a disgruntled cocaine courier. He told the two men that he knew about a local stash house, guarded by two armed men, that contained between 40 and 50 kilograms of cocaine. Zayas said he was looking for “someone to go in there and take everything.” He asked the men, ‘What do you think? ... Can that be done?” Each man assented.
Zayas met with Perez and Pedrin again on August 19. The men agreed that the *795 robbery would take place two days later, on August 21. Zayas pressed Perez and Pedrin for details about their plan. Pedrin responded, “We’ll just ... go right when you go in so we’re all together, you know what I mean? ... Put everybody down. Make them tell us where everything is at and then we leave and then we go split it up.” In response to Zayas’s questions, Pedrin said he and Perez had recruited three other men. Two of them would go into the house with Pedrin and the other would stay outside with Perez. Pedrin told Zayas that he had obtained “walkie talkies and scanners” to facilitate the operation. The details were planned by the defendants themselves. At no point did Zayas instruct Pedrin and Perez how to carry out the robbery.
On August 21, the day of the planned robbery, Zayas met with all five men. Za-yas stated again that the stash house contained between 40 and 50 kilograms of cocaine and that it was guarded by at least two armed men. Zayas then instructed Pedrin and the others to follow him to a storage locker at which they were to drop Zayas’s share of cocaine after the robbery. On the way to the locker, however, the men became suspicious and pulled into a nearby trailer park. One of the men took a different car to the storage locker location, where he saw ATF agents. He called the others and warned them that it was a sting. The men fled but were picked up by federal and state officers shortly afterward.
Pedrin was charged with conspiracy to possess with intent to distribute 40 to 50 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(l)(A)(ii), and 846. He was tried before a jury in February 2011. One of Pedrin’s codefendants, Terry Bombard, testified at Pedrin’s trial in exchange for a lighter sentence. Bombard said that he had met Pedrin over four years earlier in connection with another robbery of a drug stash house. Pedrin, he said, had organized a “gang” of nine men to steal between 200 to 250 pounds of marijuana. Bombard testified that he had participated in thirteen or fourteen stash-house robberies, most or all of them with Pedrin. Pedrin was convicted and sentenced to 210 months in prison.
Pedrin challenges his conviction and sentence on eleven grounds. We resolve Pedrin’s contention that his prosecution resulted from “outrageous government conduct” in this opinion, and the remaining ten contentions in a concurrently filed memorandum disposition. We have jurisdiction under 28 U.S.C. § 1291. We review the district court’s decision not to dismiss the indictment for outrageous government misconduct de novo, viewing the evidence in the light most favorable to the government. Black, 733 F.3d at 301. We affirm.
II. Discussion
A prosecution results from outrageous government conduct when the actions of law enforcement officers or informants are “so outrageous that due process principles would absolutely bar 'the government from invoking judicial processes to obtain a conviction.” United States v. Russell, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). A federal court must dismiss a prosecution based on such actions. The standard for dismissal on this ground is “extremely high.” United States v. Smith, 924 F.2d 889, 897 (9th Cir.1991). Dismissals are “limited to extreme cases in which the government’s conduct violates fundamental fairness.” United States v. Gurolla, 333 F.3d 944, 950 (9th Cir.2003). An indictment can be dismissed only where the government’s conduct is “so grossly shocking and so outrageous as to violate the universal sense of *796 justice.” United States v. Stinson, 647 F.3d 1196, 1209 (9th Cir.2011) (quoting United States v. Restrepo, 930 F.2d 705, 712 (9th Cir.1991)).
Pedrin argues that the reverse sting operation that led to his conviction was “outrageous government conduct” under this standard and that his indictment accordingly should be dismissed. We considered and rejected a similar argument in Black, 733 F.3d 294. Like Pedrin, the defendants in Black were the targets of a stash-house sting operation planned by Agent Zayas. Id. at 298-301. They argued that Zayas, by initiating contact with the defendants, describing the fictitious stash house, and suggesting that they rob it — all without any individualized suspicion about the defendants’ criminal history— had engaged in “outrageous” conduct, and that their indictments should be dismissed. See id. at 306. We expressed “concerns” with the ATF’s tactics, but we ultimately concluded that they “did not cross the line.” Id. at 307, 310. Black compels the same conclusion here.
In Black, we identified six factors “as relevant to whether the government’s conduct was outrageous”:
(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government’s role in creating the crime of conviction; (4) the government’s encouragement of the defendants to commit the offense conduct; (5) the nature' of the government’s participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.
Id. at 303. We noted that “the first three are most relevant to the way in which the government set up the sting,” while “the fourth and fifth look to the propriety of the government’s ongoing role in the sting,” and the last focuses on the justification for the operation. Id. at 303-04. Attempting to distinguish this case from the facts of Black, Pedrin focuses on the first three factors. He contends that Zayas knew less about the defendants’ propensity to commit crimes in this case than he knew about the defendants’ similar propensities in Black. We disagree.
First, the “major” concern present in Black — that the government found the defendants in that case by “trolling for targets,” id. at 303 — is not present here. In Black, the confidential informant visited “a bad part of town, a bad bar, you know ... bars where you’ve got ... a lot of criminal activity” in order to identify and recruit targets. Id. (alterations in original). We wrote in Black, “The risk inherent in targeting such a generalized population is' that the government could create a criminal enterprise that would not have come into being but for the temptation of a big payday....” Id. Here, by contrast, one of the defendants — Omar Perez, Pedrin’s co-conspirator — approached the informant to look for work stealing drugs. The government thus had little reason to suspect that Pedrin and Perez were “vulnerable” persons “who would not otherwise have thought of doing such a robbery.” Id.
Second, as in Black, the government’s subsequent inquiries “mitigated” any concerns it might have had that the defendants were reluctant participants in the operation. See id. at 307. On August 17, when they first met with Zayas, Pedrin and Perez readily agreed to carry out the robbery. Two days later, they had recruited three other men; had obtained “walkie talkies and scanners” to facilitate the robbery; and had assigned roles and responsibilities during the robbery. Although Pedrin and Perez were less voluble than the defendants in Black, who boasted loudly of their criminal records, their con *797 duct — like the conduct of the Black defendants — gave rise to an inference that they had previously committed similar crimes. See id. at 300, 307.
We note that in assessing whether the government’s conduct was “outrageous,” the relevant question is what the government knew when it was setting up the sting, not what it learned later. On appeal, the government argues that Ped-rin’s criminal record shows that Zayas “infiltrated [a] home invasion gang that was already engaged in criminal activity.” But the government admits that Zayas was not aware, as he was setting up the sting, that Pedrin had previously robbed other stash houses. Instead, the government learned of Pedrin’s alleged prior involvement in stash house robberies only after it had apprehended and interviewed Bombard, one of the co-conspirators. As we suggested in Black, the question is not whether a defendant in fact “may have been predisposed to commit a stash house robbery.” Id. at 306 n. 9. Rather, it is whether the government had reason to believe, in light of what it knew as it was setting up the sting, that a defendant was so predisposed. If Black was less than clear on this point, we make it clear today: What the government learns only after the fact cannot supply the individualized suspicion that is necessary to justify the sting if the government had little or no basis for such individualized suspicion when it was setting up the sting.
In this case,' however, the government knew enough about Pedrin as it was setting up the sting to eliminate the possibility that “it sought to manufacture a crime that would not have otherwise occurred.” Id. at 307. One of Pedrin’s co-conspirators, Perez, reached out to the government, and not vice versa; Pedrin readily agreed to participate in the supposed stash-house robbery; and Pedrin supplied plans and materials. This provided a sufficient basis for the government to infer that Pedrin had a predisposition to take part in the planned robbery. Like the majority in Black, we do not lightly dismiss the “concerns about the risks of government overreaching inherent in fictitious stash house sting operations.” Id. at 310 n. 13. But we are compelled by Black to conclude that the government’s conduct here was not “so grossly shocking and so outrageous as to violate the universal sense of justice.” Stinson, 647 F.3d at 1209 (quoting Restrepo, 930 F.2d at 712). The district court therefore' correctly denied Pedrin’s motion to dismiss the indictment.
Conclusion
Pedrin’s prosecution did not result from “outrageous government conduct.” For that reason, and for the reasons stated in our concurrently filed memorandum disposition, we AFFIRM his conviction and sentence.