IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 90-2976

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AN CHYI LIU ,
a/k/a FAT FRANK, and
AI-TI-TING, a/k/a EDDIE,


Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

(April 30, 1992)


Before WILLIAMS and WIENER, Circuit Judges, and LITTLE, District
Judge.[1]


LITTLE, District Judge:

Appellants Liu and Ting were found guilty by a jury of
conspiring to bribe a public official, 18 U.S.C. § 201(b)(1)(C) and
aiding and abetting the commission of the substantive offense of
bribery of the same public official, 18 U.S.C. § 201(b)(1)(C).
Liu was convicted of a separate bribery offense, and being an alien
in possession of a firearm on two separate occasions.  18 U.S.C. §

_____

[1]     District Judge of the Western District of Louisiana,
sitting by designation.

992(g)(5) and § 924(a)(2). Subsequent to sentencing, Liu and Ting lodged a timely appeal with this court. Appellants raised a number of issues that they argue justify conviction reversal or sentence reduction. We decline to grant any relief to either appellant and affirm their convictions and sentence.

An Chi Liu, born in Burma and now a Taiwan national, lived in Houston, Texas and operated a modeling studio in that city. During times material to this matter, Liu, as an alien, was without proper credentials to remain in this country. Thus, he is classified as an alien illegally and unlawfully in the United States. In late January, 1988, Houston police arrested Liu claiming that the modeling studio was a facade to mask the real operation on the premises--a whorehouse. After the arrest, Liu was approached by one of the Houston police arresting officers, Jeffrey Shaffer. Liu was asked to reveal any criminal activity of which he was aware occurring in the Houston-Asian community. Shaffer wanted Liu to be an informant. Liu accepted, and for a period of months Liu was paid to inform the Houston police department, through Shaffer, of criminal activities. Liu also provided, for pay, information to the F.B.I.

Liu admitted to Shaffer that he was a member of a notorious group known as the United Bamboo Gang. Moreover, Liu was the bodyguard for one of the gang king pins--Fargo Chen a/k/a Yellowbird. Liu's knowledge of the group's illicit activities was the subject for sale to the police.

On one occasion, Liu and Shaffer met at an oriental restaurant

in Houston. Liu told Shaffer that he had purchased an Uzi automatic weapon, a prohibited act for an alien illegally and unlawfully in the United States. 18 U.S.C. § 922 (g)(5) and 924 (a)(2). Liu admitted that the acquisition was accomplished by use of false identification. He surrendered the weapon to Shaffer who, unbeknown to Liu, had it examined by the U.S. Bureau of Alcohol, Tobacco and Firearms. The weapon was then returned to Liu.

Shaffer, through admissions from Liu, knew that Liu was in the United States illegally and needed a "green card" to authorize his continued stay and legalize his desired trip to Asia. Shaffer told Liu that he could arrange a meeting with an individual who could sell Liu a "green card." Shaffer's seemingly corrupt contact was actually a straight I.N.S. agent, Tom Cason.

Cason met with Liu, and Liu agreed to buy five green cards. Liu coordinated a meeting among himself, five potential card purchasers, Cason, and Shaffer, but the transaction cratered when one of the would be purchasers was arrested on a smuggling charge by another governmental entity.

This did not deter Liu from buying, by bribery, a green card for himself from Cason. During the period between March and November of 1989, Liu and Shaffer met many times. Liu's interest in marketing, at a great profit, albeit illegal, green cards, was unsatisfied.

Asians, living in the United States and desiring to purchase green cards, were known to Liu, and Liu was interested in satisfying their needs. Fellow defendant, Ai-Ti-Ting, was also in

3

need of a green card. Ting, in this country illegally, had knowledge of immigration procedures, a knowledge which was essential to the sale of green cards to illegal aliens. In a Houston restaurant, Shaffer and Cason met with Liu, Ting, and a man known as Steve Huang. Huang was steamed with Liu as Liu collected a "green card" acquisition fee, but did not deliver as promised. Huang's presence at the meeting was to insure receipt of the previously paid for document. Ting, the more credible and knowledgeable of the Ting-Liu duo, assured the group that Ting and Liu could sell ten green cards without any difficulty whatsoever. They agreed to acquire a ten-pack for $120,000.00 by paying cash upon receipt of the cards. The sale was set for sometime in January, 1990. Shaffer and Cason required that Ting and Liu prepare proper application documents for all the vendees, including a photograph of each prospective transferee.

The show and tell event took place in a Houston motel and was recorded on video tape. Each candidate for green card acquisition was brought to the room. Forms were completed, and pictures provided. Ting and Liu supplied translations for those without a working knowledge of the English language. The film reveals that the purchasers were informed of the illegal nature of the transaction and that Shaffer and Cason were officers of the law. Officer Shaffer received $108,000 from Ting and Liu and, in their presence, called Cason to produce and deliver the green cards. Cason received the message and arrived at the Houston motel to make delivery. No cards were delivered. The purchasers had been duped.

4

Liu, Ting and the others were arrested.  The sting was complete. As an aside, the authorities obtained a general warrant to inspect Liu's residence in search of the Uzi that Liu illegally possessed. The gun was located and confiscated.

## THE LIU APPEAL

Liu raises two issues on appeal.  We shall deal with each separately.

## EVIDENTIARY RULING DENYING TESTIMONY
## AS TO LIU'S STATED REASONS FOR BEING FEARFUL

One of the defenses asserted by defendant Liu is that he played along with Shaffer and Cason not out of a desire to make money by distributing illegally acquired green cards, but out of fear of suffering injury or death at the hands of Shaffer.  Without a knowledgeable person, such as Liu, Shaffer and Cason could not make money.  Merely having green cards did not produce any cash. There had to be a purchaser, and that purchaser needed to be an Asian knowledgeable about illegal immigrants needing valid green cards.  Thus, according to this argument, if Liu didn't perform, Shaffer would physically abuse and possibly kill Liu.

Liu now argues that the district court's refusal to admit certain testimony on this issue constitutes reversible error. Liu's cousin, Tung Shu, appeared as a witness at Liu's trial.  Shu testified that Liu told him that he was fearful for his life and that he was in a life threatening situation.  Shu was prohibited from relating to the jury what Liu said to Shu about the cause of Liu's fear.  The evidence of what was said by Liu was offered, not for the truth of the statements, but to show Liu's state of mind--

5

i.e., the state of being fearful and what caused that fear.  The ruling to exclude that evidence was subject to Liu's objection and offer of proof.

Liu link's his quest for reversible error to Federal Rule of Evidence 803(3), an exception to the rule against admission of hearsay testimony.

> The following are not excluded by the hearsay rule, even though the declarant is available as a witnesses:
>
> (3)  Then existing mental, emotional or physical condition.  A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including the statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will.

Federal Rules of Evidence 803(3)

We review evidentiary rulings by applying an abuse of discretion standard.  If abuse is found, then the error is reviewed under the harmless error doctrine.  United States v. Capote-Capote, 946 F.2d 1100, 1105 (5th Cir. 1991); United States v. Moody, 903 F.2d 321, 326 (5th Cir. 1990); United States v. Jimenez Lopez, 873 F.2d 769, 771 (5th Cir. 1989).

At trial Shu testified that during the four meetings that Liu had with Shu over a period of time, Liu "was scared" and that he had a fear of getting killed.  The district court did not allow the witnesses to say that Liu was fearful because a governmental agent would do bad things to him, nor was he allowed to testify as to generalized conversations with Liu at indefinite times about Liu's

6

fear about injury to be received from a corrupt government agent.

There was no abuse of discretion in the ruling by the district judge. Evidence of Liu's fear was admitted. Properly excluded were the alleged reasons for that fear. We find guidance in the apt analysis of Federal Rule of Evidence 803(3), given by this court in 1980.

> That rule (referring to 803(3)) by its own terms excepts from the ban on hearsay such statements as might have been made by Cohen of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed. ... But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition--`I'm scared'--and not belief--`I'm scared because Galkin threatened me.'

United States v. Cohen, 631 F.2d 1223, 1225 (5th Cir. 1980) reh'g denied 636 F.2d 315 (5th Cir. 1981) (footnote omitted). Evidence was admitted as to Liu's state of mind but not hearsay evidence as to the exact nature of the cause of that condition. There was no error in the evidentiary ruling.

## JURY INSTRUCTION ON DURESS

Liu's submitted jury instruction on the issue of duress or justification (counsel for Liu uses both interchangeably) was rejected by the court. The tendered but denied instruction provided:

> One of the issues that the government must prove is that the defendant was not forced to commit the offenses charged in the indictment. The defendant was forced if:

7

(1) He reasonably believed that participating in the offense was necessary to avoid specific and immediate threat of serious harm to himself or to another; and (2) He reasonably believed that participating in the offense was the only way to avoid this harm.

The fact the defendant may have been wrong in what he believed does not matter so long as there was a reasonable basis for what he believed and he acted reasonably under the circumstances as they existed at that time.

It is not up to the defendant to prove that he was forced to commit the offense as charged in the indictment. It is up to the government to prove that he was not.

Failure to deliver an instruction constitutes reversible error when three conditions exist:

1) The instruction is substantially correct;

2) It is not substantially covered in the charge actually given the jury; and

3) It concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present a given defense effectively.

United States v. Hunt, 794 F.2d 1095, 1097 (5th Cir. 1986). We have not been cited to, nor has our research unearthed, any Fifth Circuit case that defines a proper jury instruction on the issue of duress or justification. Although the Pattern Jury Instructions (Criminal Cases) prepared by the District Judges Association of the Fifth Circuit, 1990 Edition, published by West Publishing Company, is an excellent tool for the trial court, it does not contain a recommended instruction for the specific defense of duress, justification or coercion. The essential elements of such a defense, however, have been described in Fifth Circuit opinions. The prerequisites for entitlement to an instruction on duress were

8

recently set forth in U.S. v. Harvey, 897 F.2d 1300 (5th Cir. 1990).

> Before a defendant charged with such an offense is entitled to a jury instruction on the defense of justification, however, he must show: (1) that defendant was under an unlawful and `present, imminent, and impending (threat) of such a nature as to induce a well-grounded apprehension of death or serious bodily injury.'; (2) that defendant had not `recklessly or negligently placed himself in a situation in which it was probable that he would be (forced to choose the criminal conduct)'; (3) that defendant had no `reasonable legal alternative to violating the law; a chance both to refuse to do the criminal act and also to avoid the threatened harm'; and (4) `that a direct causal relationship may be reasonably anticipated between the (criminal) action taken and the avoidance of (threatened) harm.'

Id. at 1304-5 quoting United States v. Harper, 802 F.2d 115, 117 (5th Cir. 1986). The genesis of those four essential characteristics of duress or coercion in this circuit is United States v. Gant, 691 F.2d 1159, 1162 (5th Cir. 1982). Other circuits describe the defense in a nearly identical manner. See, e.g., United States v. Michelson, 559 F.2d 567, 569 (9th Cir. 1977); United States v. Lee, 694 F.2d 649, 654 (11th Cir.), cert. denied 460 U.S. 1086, 103 S. Ct. 1779, (1983); United States v. Campbell, 675 F.2d 815, 820-821 (6th Cir.), cert. denied 459 U.S. 850, 103 S. Ct. 112, 74 L. Ed. 2d 99 (1982).

With that background we are not surprised to find that Pattern Jury Instructions for use in criminal cases in the Sixth, Seventh, Ninth and Eleventh Circuits adopt virtually identical instructions on coercion, intimidation, and duress. For example, the Eleventh Circuit adopts language that contains all of the elements required by this circuit's jurisprudence:

9

It is the theory of the defense in this case that although the Defendant may have committed the acts charged in the indictment, he did not do so voluntarily, but only because of force or coercion in the form of intimidation and threats of bodily harm to himself (or his family).

As you have already been instructed willfulness is an essential element of the crime charged in the indictment, and acts done involuntarily because of coercion are not done willfully.

In order to excuse an act that would otherwise be criminal, however, the intimidation or coercion must be present and immediate, and must be of such a nature that it induces a reasonable and well-founded fear of death or serious bodily injury to one's self or someone else; and there must be no reasonable opportunity to escape from coercion without participating in the crime.

If the evidence in the case leaves you with a reasonable doubt that the Defendant acted willfully as charged, then it is your duty to find the Defendant not guilty.

Pattern Jury Instructions, Criminal Cases (U.S. 11th Cir., West Publishing Co. 1985).

The charge submitted by Liu and Ting on the affirmative defense of duress does not comport with the requirements created by Fifth Circuit jurisprudence. It is clear that the jury should be informed that the defense is available if the defendant proves that he, or a member of his family, was under a present, imminent, or impending threat of death or serious bodily injury; that he had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; that he had no reasonable opportunity to escape from the situation and avoid the threatened harm; and that a direct causal relationship may be reasonably anticipated between the criminal act taken and the avoidance of the threatened harm. The submitted

10

instruction is deficient because it contains no reference to the defendant's burden to show proof that he did not negligently or recklessly place himself in a situation in which it was possible that he would be forced to choose the criminal conduct. Moreover, there is no specific reference in the instruction to the requirement that the defendant prove that he did not have a reasonable legal alternative to violating the law, i.e., a chance both to refuse to do the criminal act, and to avoid the threatened harm. In the submitted instruction the sentence, "He reasonably believed that participating in the offense was the only way to avoid this harm", is opaque and lacks the direction for analysis that a jury is entitled to receive. Having concluded that the submitted instruction is not a correct statement of the law, we are not required to adjudicate the legal consequence of failing to give the instruction.

We do note in passing, however, that a thorough review of the record leads the court to conclude that there is no evidence upon which a reasonable juror could find that Liu was laboring under a present, imminent and impending threat of such a nature as to indicate a well grounded apprehension of death or serious bodily injury. The testimony of fellow defendant Ting that Liu was concerned that his Quisling status would be disclosed to his fellow Asians by Shaffer, and that such action would mean serious retribution by the Asians, lacks any merit as being a present, imminent, impending threat of death or injury. Ting's further testimony that Liu was afraid that Agent Shaffer would wipe him out

11

if Liu failed to cooperate, reveals nothing definite as to when the damaging event would take place.

Of even greater significance is the fact that the record does not reveal that Liu was without a reasonable legal alternative to violating the law, or that he had no chance to refuse to do the criminal act, or to avoid the threatened harm. Liu purchased a green card for himself. He used that card to travel between Asia and the United States. He returned to Houston from Taiwan and actively sought to market green cards to illegal aliens. Liu had a number of reasonable alternatives to the continued illegality. He could have surrendered to federal officials in any city in the United States. He could have communicated with federal officials in any city in the United States. He could have remained abroad. He could have sought protection in another city. We must remember that the initial meeting between Shaffer and Liu occurred in January of 1988. The arrest, as a result of presentation of cash for more green cards, was made in January of 1990. For obvious reasons, the record is a fertile field to find many reasonable legal alternatives to violating the law over a two year period. Liu is not entitled to an instruction on duress.

## THE TING APPEAL

### JURY INSTRUCTION ON DURESS

Ai-Ti-Ting raises the same complaint voiced by Liu over the trial court's failure to submit the duress instruction to the jury. For the reasons previously given, we find the instruction is incorrect as a matter of law and therefore need not have been

12

given.

We take this opportunity to observe that even if the instruction were correct, Ting was not entitled to a duress instruction. Ting had ample opportunity to absent himself from the criminal surroundings. Ting met with agent Shaffer in November of 1989 at Steven Huang's urgings. Others than Shaffer were the prime movers in getting Ting involved; for it was Ting who knew the immigration procedures, knew foreigners in need of green cards, and had a good community reputation. He traveled the crooked path not because he was forced to do so, but because he elected to do so. Ting had police connections of his own. He could have reported the crooked cop but chose not to do so. Instead, Ting called no less than forty of his friends in hopes of finding customers for the illicitly obtained green cards. Ting even accepted a reduced fee charge for a green card for himself.

### ENTRAPMENT

Ting's second argument is that he was the victim of the government's entrapment and that he was never predisposed to traffic in green cards.

Recently this court summarized the law of entrapment.

> Entrapment is an affirmative defense that requires a defendant to show he was induced to commit a criminal act by a government agent and that he was not predisposed to commit the act without the inducement. See Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). `Entrapment, as a doctrine, asks ... what was the defendant's mind before he did the charged acts.' United States v. Kang, 934 F.2d 621, 624 (5th Cir. 1991) (quoting United States v. Henry, 749 F.2d 203, 213 (5th Cir. 1984) (en banc) emphasis in original)). `The critical determination is whether the criminal intent or design originated with the defendant or with

13

the government agents.'  Id. (citing <u>United States v.</u> <u>Nations</u>, 764 F.2d 1073, 1079 (5th Cir. 1985)).  To rely upon the entrapment defense, the defendant must as a threshold matter `present evidence that government conduct created a substantial risk that an offense would be committed by a person other than one ready to commit it.'  Id. (quoting <u>United States v. Johnson</u>, 872 F.2d 612, 620 (5th Cir.), <u>reh'g</u> <u>denied</u>, 880 F.2d 413 (1989)). This requires the defendant to establish (1) that he lacked predisposition to commit the crime and (2) that government involvement and inducement amount to more than just an opportunity to commit the crime.  Id. `If the defendant succeeds in meeting his burden, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense.'  Id.

<u>U.S. v. Pruneda-Gonzalez</u>, 953 F.2d 190, 197 (5th Cir. 1992).

The defendant failed to present evidence that he lacked a predisposition to commit the crime.  The evidence reveals that Ting had a job that afforded him a position of respect and one that allowed him to make acquaintances with orientals of substance.  He was in a position to provide important services to Taiwan nationals in this country.  The dark side of Ting's Texas life was that he did not posses the one thing necessary to perpetuate his comfortable status--a green card.  He attempted to marry a partner with credentials to give him the protected status, but without success.  With a green card, Ting could cement his presence in this country and also could travel to Taiwan.  Thus, Ting was ripe for the enlistment by Liu (not a government agent) to participate in the green card scam.  As a matter of law, Ting was not entrapped. The trial judge did not err in so ruling.

### STATUS AS A MANAGER OR SUPERVISOR

Ting argues on appeal, as he did prior to his sentencing, that he was not a manager or supervisor of any co-conspirators.  He

14

takes umbrage with the trial court awarding him a three level upward adjustment pursuant to U.S.S.G. § 3B1.1(b).  The finding of the trial court resulted in a sentence more severe than that which Ting might have received had he not been a manager or supervisor.

We review the trial court's determination that Ting was a manager or supervisor under a clearly erroneous standard.  United States v. Barreto, 871 F.2d 511 (5th Cir. 1989); United States v. Alfaro, 919 F.2d 962 (5th Cir. 1990).  While admitting that we are not controlled or governed by the Commentary to the Sentencing Guidelines, we observe that that source suggests that the court consider the following factors when making its decision:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Commentary, U.S.S.G. § 3B1.1(b).

Although Ting contends that he did no more than translate, the facts paint a picture of a manager, not a minion.  The success of the caper was bottomed on customers willing to engage in an illicit transaction.  Ting had the credentials, the contacts, and the reputation to find accomplices.  Ting produced seven customers, administered the application process, provided a sense of safety and solace to his fellow conspirators, and stood to gain a green card for himself at little cost.  The facts set forth in the PSI have not been assailed as unreliable, only the court's conclusion drawn from those facts.  We are not convinced that the findings by

15

the district court are clearly erroneous.  The sentence need not be vacated.

For the foregoing reasons, the convictions are AFFIRMED.