**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YVON WAGNER, as the personal representative of the Estate of Eric Vogel, | No. 10-15501 |
| *Plaintiff-Appellant*, | D.C. No. 2:07-cv-00819-EHC |
| v. | |
| COUNTY OF MARICOPA, a political subdivision of the State of Arizona; JOSEPH M. ARPAIO, husband; UNKNOWN ARPAIO, Named as Jane Doe Arpaio - wife, *Defendants-Appellees*. | ORDER AND OPINION |

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, Senior District Judge, Presiding

Argued and Submitted
April 15, 2011—San Francisco, California

Filed November 16, 2012

Before: John T. Noonan and N. Randy Smith, Circuit
Judges, and Frederic Block, Senior District Judge.[*]

Order;
Opinion by Judge Noonan;
Dissent by Judge N.R. Smith

**SUMMARY**[**]

The panel withdrew its prior opinion and in a newly filed
opinion reversed the district court's judgment, entered
following a jury trial, and remanded in an action brought by
the Estate of Eric Vogel asserting that jail officials were
partially responsible for Vogel's death from acute cardiac
arrhythmia following his release from jail.

The Estate alleged that County of Maricopa jail officers
subjected Vogel, who suffered from a mental illness, to an
unreasonable search and seizure while he was a pretrial
detainee.  Prior to transferring Vogel into the jail's
psychiatric unit, defendants subjected him to a "dress out,"
during which they forced him on the ground, stripped him of
all his clothes, and changed him into the jail outfit, which
included pink underwear.  The panel held that the district
court erred by limiting the testimony of Vogel's sister at trial
under the hearsay rule because her statements were offered to

---

[*] The Honorable Frederic Block, Senior District Judge for the U.S.
District Court for Eastern New York, Brooklyn, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

establish Vogel's state of mind.  The panel further held that the district court erred by excluding references to the pink underwear, and that, unexplained and undefended, the dress-out in pink appeared to be punishment without legal justification.  The panel held that it appeared that this due process question was still open for exploration at trial on remand.  Alternatively, the panel held that plaintiff may prevail on the narrower issue of whether defendants were deliberately indifferent to Vogel's serious medical needs.  Finally, the panel held that the district court should have permitted Vogel's expert to offer the opinion that the stress of the dress-out incident could have exacerbated Vogel's mental illness.

Dissenting, Judge N. Smith stated that the majority failed to correctly construe the hearsay rule and failed to give the proper deference to the district court's other evidentiary rulings.

## COUNSEL

John M. Curtain, Phoenix, Arizona, for plaintiff-appellant.

Eileen D. Gilbride, Phoenix, Arizona, for defendants-appellees.

## ORDER

The opinion and dissent filed on March 7, 2012 are hereby WITHDRAWN.

The majority of the panel votes to deny the petition for rehearing. Judge N.R. Smith votes to grant the petition for rehearing and petition for rehearing en banc. Judge Noonan and Judge Block recommend denying the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is DENIED and the petition for rehearing en banc is DENIED.

---

## OPINION

NOONAN, Circuit Judge:

The central figure in this case, Eric Vogel, suffered from mental illness. Our system of laws is administered by rational human beings. It has always been a challenge to the legal system to interact with the irrational.

Yvon Wagner, as the personal representative of the estate of her brother, Eric Vogel, appeals the judgment of the district court in favor of the defendants, County of Maricopa and Joseph Arpaio. We reverse the judgment and remand for a new trial.

## **FACTS**

Eric Vogel was born on December 21, 1964.  By the age of six, he was showing signs of potential illness.  His parents withdrew him from school when he was in the second grade, and he was thereafter home-schooled until he graduated from high school.  He attended a community college for two semesters and part of a semester at Arizona State University.  Thereafter, he simply lived at home.

Living at home, without further formal education, Vogel had no gainful employment and lived a remarkably restricted life.  The windows of his home itself were covered with blankets and tape so that no one could see in.  After his father's death or departure, he lived alone with his mother.  He left the home no more than two or three times to attend the funerals of relatives.  In October 2001, when Vogel was 36, his sister, Yvon Wagner, visited the home and found him to be delusional, imagining that a snake was around his neck.

On the morning of November 12, 2001, for no apparent reason, Vogel left his home.  Police responded to a report of a burglar in the neighborhood and spotted Vogel as a possible suspect.  The first officer on the scene struggled to get control of him while Vogel shouted, "Kill me."  When a second officer arrived, Vogel stated that he, Vogel, must see the president.  The police said they would accommodate him.  He calmed down and they drove him to the Phoenix jail.

In Arizona, common jails are kept by the sheriff of the county.  Ariz. Rev. Stat. § 31-101.  Joseph Arpaio, as the sheriff of Maricopa County, kept the jail to which Vogel was brought.

Vogel was put under arrest for assaulting a police officer. He completed a medical questionnaire, indicating that he had high blood pressure but no other health problems. A classification counselor interviewed him and placed a psychiatric hold on him. A psychological counselor examined him and concluded that he needed psychiatric care.

He was put in an isolation cell with a huge window opening the cell to the view of the jailers and to inmates. The next morning, November 13, Vogel was assessed by a psychological counselor as disoriented, paranoid, and psychotic. He told her that he was at the World Trade Center getting messages from satellites. She obtained an order for his transfer to the inpatient psychiatric unit at the jail.

That afternoon, Vogel was informed that he must "dress-out." In the argot of the jail, "to dress-out" was to change from one's civilian clothes to prison garb approved by Sheriff Arpaio. The prison outfit included pink underwear. Vogel declined to change.

The "dress-out" prison officer summoned assistance – four other officers, each to hold an arm or a leg while Vogel's clothes were changed. He was placed on the ground, stripped of all his clothes, and forced into the jail ensemble including the pink underwear. As the process went on, he shouted that he was being raped. The officers were aware that he was being transferred to the Psychiatric Unit. At the end of the "dress-out" Vogel was wheeled there in "a restraint chair."

Vogel received treatment for a week and was then bailed out by his mother. On December 6, 2001, he was in his mother's car when she had a minor traffic accident. The police were summoned. Before they arrived, however, Vogel

left the scene and attempted to walk four or five miles to his home. He died the next day. The cause, according to the Maricopa County Medical Examiner, was acute cardiac arrhythmia.

## PROCEEDINGS

On December 6, 2002, Vogel's mother as representative of his estate began this action in Arizona Superior Court. It was removed by the defendants to the federal district court, which eventually returned the case to the state court. The plaintiff amended to assert a claim against the defendants for violation of 42 U.S.C. § 1983 by subjecting Vogel to an unreasonable search and seizure, denying due process and the equal protection of the laws, and acting with deliberate indifference to his serious medical needs. A claim was also asserted under the Americans with Disability Act, 42 U.S.C. § 12131, et seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as several claims under Arizona law. The case was transferred back to the federal district court.

In limine, the district court ruled that Vogel's mother and sister could not testify to what he told them about events at the jail. The court also ruled that counsel could not refer to "pink underwear" unless he could show that the record contained "credible evidence" that Vogel was aware of the color of the underwear. The court also precluded the testimony of the plaintiff's expert Dr. Spitz that Vogel's death was in part caused by the "dress-out," thereby preventing the issue of liability for the death from reaching the jury. The court also limited the testimony of Dr. Esplin.

Before trial began, Vogel's mother died and his sister Yvon Wagner replaced her as the representative of the estate.

At the close of the trial, the court denied plaintiff's counsel the opportunity to make a rebuttal.

The jury returned a verdict for the defendants on each count. This appeal followed.

## DISCUSSION

We review evidentiary rulings for abuse of discretion and reverse if the exercise of discretion is both erroneous and prejudicial. As Judge Smith points out, it is not entirely clear whether construction of a hearsay rule is a matter of discretion or a legal issue subject to de novo review. *Compare United States v. Stinson*, 647 F.3d 1196, 1210-11 (9th Cir. 2011), *with United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000). We need not resolve the ambiguity here because our conclusions would be the same under either standard. We begin with the ruling limiting the testimony of Yvon Wagner.

**Exclusion of Wagner's testimony.** Wagner in her deposition stated:

> He [her brother] felt he was being raped. He felt one of the officers attempted to put his penis in his mouth and that he had to keep his mouth so tight that he bruised his outer lips to avoid being accosted that way.
>
> He was sure they were going to rape him. He hollered to people. He was sure that all the inmates heard him saying who he was and that he was being raped and please help him.

And they were, you know, have [sic] a party at his expense. . . .

He believed he had been raped. He believed somebody took their penis out of their pants and attempted to insert it in his mouth. And that's as close to – my brother was a virgin. He – 36 years old, never touched another woman. This was very, I'm sure, frightening for him.

In response to the motion in limine, Wagner made the same argument she makes now. She argued that her statements were

not being offered to prove the details of the incident at the jail. Her testimony is not to prove an actual rape, but instead to show her brother's state of mind following his incarceration. Her testimony establish[es] the impact that the event had on Eric. Yvon can testify as to the statements he made, his tone of voice, and his state of mind in making them.

Federal Rule of Evidence 803(3) excepts from the general exclusion of hearsay "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed[.]" The "declarant" is the person who made the out-of-court statement. *See* Fed. R. Evid. 801(b).

Indisputably, Wagner could have testified at trial about the impact the jail incident had on Vogel, how his mood was following the incident, how disturbed he seemed, and even what he thought happened to him during the incident, all without putting inadmissible hearsay before the jury. None of this testimony would have been put forth in order to establish the truth of what he had said. Wagner proposed to testify about how extremely delusional Vogel was following the incident, and more importantly, the emotional impact the incident had on him, including how humiliated he now felt by the pink underwear. She was not asserting the truth of anything that Vogel said had happened to him in jail.

Her testimony was admissible not to prove "the fact remembered or believed" but the "mental feeling" of Vogel. As our dissenting colleague points out, the limiting language of Rule 803(3) bars "'statements as to why [the declarant] held the particular state of mind, or what he might have believed that would have induced the state of mind.'" *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987) (quoting *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980)). The bar applies only when the statements are offered to prove the truth of the fact underlying the memory or belief. In *Emmert*, for example, the defendant sought to introduce his out-of-court statement that "he was scared because of the threats made by the agents." 829 F.2d at 810.

Here, Vogel's statements to his sister were offered to establish his state of mind, not that he was raped or that he went through the dress-out procedure. The statements were offered to show his state of mind at the time of the conversation, thus satisfying any contemporaneity requirement. *See United States v. Ponticelli*, 622 F.2d 985, 991 (9th Cir. 1980), *overruled on other grounds by United*

*States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc).    That Vogel was subjected to the dress-out was established by the testimony of the defendants' employees. The jury could infer the connection between the dress-out and Vogel's mental state.    Exclusion of this evidence was erroneous.

The defense argument that Wagner lacked personal knowledge is mistaken.  She had personal knowledge of how Vogel had been impacted by the incident.  She testified as a percipient of what she had observed.

The court curtailed Yvon Wagner's testimony further by not permitting her to testify to Vogel's conversation with her where he gave his sense of humiliation at being forced to wear pink underwear or his sense of having been subjected to a rape.  The court banned any testimony mentioning "rape" or "gang rape" unless counsel showed that the terms were not "unduly prejudicial."  As already noted, the court excluded reference to the color of the clothes put on Vogel unless there was credible evidence that "Vogel was aware of the color of the jail-issued underwear."

The rulings as to "rape" and "gang rape" misconceived any testimony Wagner would have offered.  She would have used the words to show her brother's present state of mind, not his past experience.

As to testimony of Vogel's perception of the color, Wagner's testimony was to the current state of her brother's mind when he spoke to her.  His mind was focused on the implications of being dressed in pink.  That he had been dressed in pink was not a delusion.  It was a fact, essential to his experience and to the Estate's deliberate indifference and

due process claims. The jury was asked to evaluate whether the jail's measures were taken in furtherance of a legitimate goal or whether they were, instead, punitive. The exclusion of any mention of "pink underwear" or "rape" delivered a second blow to the plaintiff's case.

That Vogel was delusional does not mean that he was incapable of seeing. If you pricked him, he bled. As his eyes saw the pink, his mind made the association of the color. So at least a jury could infer from the impact of the dress-out on Vogel, an impact apparent from his conversation with his sister.

**Exclusion of references to the color pink.** When a color of such symbolic significance is selected for jail underwear, it is difficult to believe that the choice of color was random. The County offers no penological reason, indeed no explanation whatsoever for its jail's odd choice. Given the cultural context, it is a fair inference that the color is chosen to symbolize a loss of masculine identity and power, to shame and stigmatize the male prisoners as feminine.

Unpleasant physical measures – e.g., a strip search – may be necessary to secure the safety of an institution even though they impinge on the dignity of innocent inmates. *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc). As the Supreme Court has explained:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is

arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (citations omitted). Unexplained and undefended, the dress-out in pink appears to be punishment without legal justification.

It appears to us that this due process question is still open for exploration at trial on remand. Alternatively, the plaintiff may prevail on the narrower proposition that for the jail to apply this procedure automatically to a man its own staff had identified as in need of psychiatric treatment was in deliberate indifference to his serious medical needs. Because of the evidentiary rulings of the trial court, neither issue was properly presented to the jury.

**Medical experts.** Wagner presented Daniel Spitz, the chief medical examiner of Macomb County, Michigan, a county embracing southern Detroit. In his deposition Spitz had stated that he had conducted thousands of autopsies; that he had examined three to five cases where schizophrenia in relation to cardiac arrhythmia was the cause of death; and that there was forensic and psychiatric literature on the connection between schizophrenia and cardiac arrhythmia. He gave the opinion that the sudden and unexpected death of Vogel was due to cardiac arrhythmia intensified by an increase in schizophrenia and that that increase in schizophrenia was "likely" due to Vogel's recollection of his treatment at the jail and his fear of returning to it.

The district court held that Dr. Spitz failed to meet the qualifications for an expert set by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). His testimony was excluded entirely.

The defense does not deny the foundation of Spitz's opinion. Its Reply Brief states: "No one disputes the general proposition that persons with severe schizophrenia have an increased incidence of the kind of arrhythmia that killed Vogel. Everyone agrees that Vogel's underlying mental illness was the factor that induced the cardiac arrhythmia." The defendants deny that anyone could determine what caused the particular increase in the arrhythmia that killed Vogel.

The purpose of expert testimony is to "assist the trier of fact to understand the evidence or to determine a fact in issue" by providing opinions on "scientific, technical, or other specialized knowledge[.]" Fed. R. Evid. 702 (2008). To guard against the risk that jurors will accept an expert's testimony simply because he or she is an expert, a district court must ensure that all expert testimony is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that *Daubert* applies to "all expert testimony"). The test for reliability is flexible and depends on the discipline involved. *See Kumho*, 526 U.S. at 150. "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

The district court's decision to exclude Dr. Spitz's opinion as to a likelihood that the dress-out procedure actually caused Vogel's death was a reasonable application of

*Daubert*. This opinion by Dr. Spitz was not supported by the typical *Daubert* factors—testing, peer review and general acceptance. Dr. Spitz did not explain, for example, how the generally accepted facts, – (1) that the incidence of cardiac arrhythmia is disproportionately high among schizophrenics and (2) that stress can render the condition fatal – allowed him to determine the specific event that triggered Vogel's death. Nor did he explain how having seen four or five cases of fatal cardiac arrhythmia in schizophrenics helped him reach his conclusion.

Generally accepted facts and experience might lead a medical expert to reliably opine (as Dr. Ehrlich did) that the dress-out procedure *could have* been a triggering stressor. Although Dr. Spitz's and Dr. Ehrlich's opinions are similar in that respect, Dr. Spitz went farther and offered an opinion as to an actual cause. It is this leap that dispositively distinguishes the two experts.

However, the district court should not have excluded Dr. Spitz's testimony in its entirety. Dr. Spitz should have been permitted to offer the opinion that the stress of the dress-out incident *could have* exacerbated Vogel's mental illness. From this, the jury could infer that the dress-out was a cause of the heart attack. It was for the jury, not for the court as gatekeeper, to determine whether or not the stress of the incident was an actual cause of Vogel's heart attack.

The plaintiff also offered the testimony of Phillip Esplin, a Phoenix psychologist. Esplin had originally been proposed as a witness by the County and had prepared a report as required by Fed. R. Civ. P. 26(a)(2). Taking his deposition, Wagner found his testimony favorable to her position and

sought him as a witness at trial. The district court permitted but significantly curtailed his testimony.

In both of its rulings the district court pointed out the dependence of the two proposed experts on Wagner's reported conversations with her brother. As the district court excluded Wagner's testimony as to the conversations, so it found that the experts could not base their opinions upon Wagner's accounts. As we have already indicated, the exclusion of testimony showing Vogel's state of mind was both error and prejudicial to the plaintiff. It was equally error and prejudicial to exclude the two experts' opinions based on that testimony.

**Argument to the Jury.** The district court abruptly eliminated the plaintiff's opportunity for rebuttal argument. No good reason was given for this disappointment of the plaintiff's legitimate expectation. If the court intends to restrict rebuttal, the litigants should be so advised prior to the argument.

Counsel for the county suggested that Vogel's family had not provided adequate care for Eric Vogel. The argument was irrelevant and improper.

For the reasons stated, the judgment of the district court is REVERSED and the case is REMANDED for proceedings in accordance with this opinion.

---

N.R. SMITH, Circuit Judge, dissenting:

In its opinion, the majority fails to correctly construe the hearsay rule and fails to give the proper deference to the

district court's other evidentiary rulings. I must therefore dissent because:

1. Assuming (but not deciding) that a de novo standard of review applies when determining whether a statement is hearsay, the majority fails to properly construe the hearsay rule. Under the hearsay rule, statements asserting a declarant's beliefs are hearsay, if offered to prove the declarant's belief or offered for a purpose that requires the declarant to believe the matters asserted are true. Therefore, the district court did not err in concluding that Yvon Wagner's testimony was hearsay.

2. The majority fails to apply the "substantially deferential" abuse of discretion test, recently elucidated by our en banc panel in *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc), for the remaining evidentiary issues appealed here. Though an appellate jurist may have ruled differently on these issues, "we may not simply substitute our view for that of the district court, but rather must give the district court's findings deference." *Id.*

## I.

## STANDARD OF REVIEW

This circuit's case law is not entirely clear regarding whether we review de novo a district court's decision that a statement is or is not hearsay. *Compare United States v. Stinson*, 647 F.3d 1196, 1210 (9th Cir. 2011) ("We review a district court's evidentiary rulings for abuse of discretion."), *and United States v. Tran*, 568 F.3d 1156, 1162 (9th Cir. 2009) (applying an abuse of discretion standard in determining whether a statement is hearsay under Rule 801),

*with Mahone v. Lehman*, 347 F.3d 1170, 1173–74 (9th Cir. 2003) ("We review the district court's construction of the hearsay rule de novo . . . ." (quoting *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002))), *United States v. Collicott*, 92 F.3d 973, 978–82 (9th Cir. 1996) (holding that the district court erred, because the statements at issue were hearsay and not admissible under Rule 801(d)(1)(B), never mentioning whether the district court abused its discretion, but rather seems to have reviewed the hearsay determination de novo), *and United States v. Warren*, 25 F.3d 890, 894–95 (9th Cir. 1994) (held that the statements at issue were admissible under Rule 801(d)(2)(A) because they were not hearsay, with no mention of an abuse of discretion).

The Second Circuit and Sixth Circuit have held that a district court's determination whether a statement is hearsay is reviewed de novo. *United States. v. Ferguson*, 653 F.3d 61, 86 (2d Cir. 2011); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 378–381 (6th Cir. 2009). *But see Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 716–17 (6th Cir. 1999) ("Therefore, in disregard of our heretofore well-settled precedent that hearsay evidentiary rulings are reviewed de novo, we shall review the district court's ruling for an abuse of discretion." (citation omitted)).

We review the district court's remaining evidentiary rulings for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). We do not reverse evidentiary rulings unless the rulings are "manifestly erroneous *and* prejudicial." *Orr*, 285 F.3d at 773. "This includes the exclusion of evidence under a hearsay rule." *Stinson*, 647 F.3d at 1210. We also review the district court's handling of closing arguments for an abuse of discretion.

*United States v. Lazarenko*, 564 F.3d 1026, 1043 (9th Cir. 2009).

Our circuit employs a "significantly deferential" two-step test to determine whether a district court abused its discretion. *Hinkson*, 585 F.3d at 1262. The first step "is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *Id.* If so, the second step "is to determine whether the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577 (1985)). "If any of these three apply, only then are we able to have a 'definite and firm conviction' that the district court reached a conclusion that was a 'mistake' or was not among its 'permissible' options, and thus that it abused its discretion by making a clearly erroneous finding of fact." *Id.* In other words, "we do not automatically *reverse* a district court's factual finding if we decide a 'mistake has been committed.'" *Id.* at 1263.

## II.

## WAGNER'S TESTIMONY

The majority first concludes that the district court erred by excluding testimony from Vogel's sister, Yvon Wagner, regarding statements made by Vogel (who was deceased before trial).[1] Wagner would have testified regarding Vogel's

---

[1] Wagner would have testified that Vogel (1) said the detention officers dressed him in "pink underwear, in pink slippers and, again, at his expense they were accosting him" during the dress-out procedure; (2) believed he

thoughts and beliefs during the dress-out procedure based on statements Vogel purportedly made—after the fact—to Wagner. The majority finds that the district court erred, apparently as a matter of law, no matter whether the standard of review is de novo or abuse of discretion. The majority erroneously concludes that Wagner's testimony was not offered to prove what Vogel asserted.

**A. Wagner's testimony was hearsay evidence**

The Estate argues that Wagner's testimony was not hearsay, because it was not offered to prove the details of the dress-out procedure (i.e., that Vogel was actually raped). Instead, the Estate argues that Wagner's testimony was offered to show Vogel's state of mind following the dress-out procedure and the lasting impact the event had on Vogel following his release. The majority asserts that Wagner "was not asserting the truth of anything that Vogel said had happened to him in jail." Maj. Op. at 10. I disagree with both. Wagner's testimony was offered to prove the truth of the matter asserted—i.e., that Vogel believed the events he described happened. The district court did not incorrectly construe or apply the hearsay rule.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The majority agrees that, if Wagner's

---

had been raped; (3) "felt one of the officers attempted to put his penis in his mouth and that he had to keep his mouth so tight that he bruised his outer lips to avoid being accosted that way," and (4) believed the officers used the pink underwear to put him in a vulnerable position before a planned sex "party."

testimony—including Vogel's statements that (1) he was forcibly undressed by detention officers, (2) he was dressed in pink underwear and slippers, (3) the officers "manhandled" him on the floor of his jail cell, and (4) he called out to other inmates for help—were offered for the truth of the matter asserted, it would be hearsay. Even if this information were consistent with other evidence in this case, it could not be proven by Wagner using hearsay evidence.

However, the Estate and the majority assert that Wagner's testimony is not offered to prove the "truth of anything that Vogel said had happened to him in jail." Maj. Op. at 10. That assertion may be true, but it is not focused on Wagner's statements. For example, Wagner testified that Vogel (1) "*felt* he was being raped," (2) "*felt* one of the officers attempted to put his penis in his mouth," (3) "*believed* he was being raped," and (4) "*believed* the pink underwear was used to put him in [a] vulnerable position with these officers." Wagner's testimony is offered to prove the truth of what Vogel asserted—i.e., that he believed what he described occurred. A statement is hearsay if offered to prove the truth of the *matter asserted*. Focusing on Wagner's statements, they are hearsay, because they were offered to show that Vogel *actually believed* the facts asserted. 30B Michael H. Graham, *Federal Practice & Procedure* § 7044 (interim ed. 2000) (explaining that second-hand statements of belief are hearsay, but may be admissible under Rule 803(3)'s exception to the hearsay rule). Further, the statements are hearsay, because it must be proven that Vogel believed the matters asserted were true for the Estate's mental state argument to succeed. *Id.* § 7006 ("If the declarant must believe the matter asserted to be true for any inference to logically flow, . . . the hearsay risks of sincerity and narration are present. Such statements are thus properly classified as

hearsay."). The Estate never made an offer of proof to demonstrate that the proffered testimony complied with the hearsay rule. Therefore, the district court's determination (that Wagner's testimony was hearsay) was not erroneous and the district court did not misconstrue the hearsay rule.

**B. Wagner's testimony did not fall under Rule 803(3)'s then-existing state of mind exception to the hearsay rule**

The Estate argues that, even if Wagner's testimony were hearsay, it was admissible as evidence under the state of mind exception in Federal Rule of Evidence 803(3). The majority agrees. However, the district court disagreed and, because this is a discretionary decision, we must afford the district court's decision substantial deference. Here, the district court's determination that Wagner's testimony regarding Vogel's post-release statements did not fall under Rule 803(3)'s state of mind exception was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record. The statements (1) were statements of memory or belief made at least one week after the events at issue; and (2) were offered not simply to demonstrate Vogel's present mental condition but his past mental condition (i.e., that he was agitated), and also to explain *why* he was agitated (i.e., that he believed he was being raped). Therefore, although we may have decided this issue differently, the district court did not abuse its discretion.

Rule 803(3) creates an exception to the hearsay rule for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed* . . . ." Fed. R. Evid. 803(3)

(2010) (emphasis added). Vogel's statements do not meet Rule 803(3)'s foundational requirements of "contemporaneousness, [lack of] chance for reflection, and relevance." *United States v. Ponticelli*, 622 F.2d 985, 991 (9th Cir. 1980), *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc). Vogel explained the dress out procedure to his family following his release from jail, which was at least seven days after the procedure took place. These were "statement[s] of memory," which are expressly prohibited under Rule 803(3). The Rules of Evidence exclude statements of memory, because "[t]he more time that elapses between the declaration and the period about which the declarant is commenting, the less reliable is his statement . . . . The state of mind declaration also has probative value, because the declarant presumably has no chance for reflection and therefore for misrepresentation." *Ponticelli*, 622 F.2d at 991. Vogel conceivably could have misrepresented what happened at the jail (or what he *believed* happened) to explain or justify his unruly conduct with the officers. Thus, although detention officers' testimony about what Vogel said *during* the dress-out procedure is admissible (given its contemporaneity), Vogel's statements a week or two after the fact do not provide the same probative value contemplated by the exception in Rule 803(3). *See United States v. Miller*, 874 F.2d 1255, 1265 (9th Cir. 1989) (holding that hearsay statements made less than 24 hours after an event did not meet the contemporaneity and lack of reflection requirements under Rule 803(3)).

Additionally, Wagner's statements were offered to show not only that Vogel was agitated during the dress-out procedure, but also *why* he was agitated. Such use of Wagner's statements is not permitted under Rule 803(3), as

interpreted by our circuit. We stated in *United States v. Emmert* that "the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or *what he might have believed* that would have induced the state of mind." 829 F.2d 805, 810 (9th Cir. 1987) (emphasis added) (quoting *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980)); *see also id.* ("[Rule 803(3)] . . . narrowly limit[s] admissible statements to declarations of condition—'I'm scared'—and *not belief*—'I'm scared because [someone] threatened me.'" (emphasis altered) (internal quotation marks omitted)). We reaffirmed the validity of *Emmert* in *United States v. Fontenot* by holding that hearsay statements did not fall under the exception in Rule 803(3), because the statements related why the declarant held the particular state of mind. *United States v. Fontenot*, 14 F.3d 1364, 1371 (9th Cir. 1994). The Fifth Circuit and Tenth Circuit also do not allow statements that identify why the declarant has the particular state of mind. *See, e.g.*, *United States v. Lin*, 960 F.2d 449, 452 (5th Cir. 1992) (holding that "[e]vidence of . . . fear was admitted," but "[p]roperly excluded were the alleged reasons for that fear" (citing *Cohen*, 631 F.2d at 1225)); *United States v. Ledford*, 443 F.3d 702, 709–10 (10th Cir. 2005) ("The phrase 'because the defendant threatened me' is expressly outside the state-of-mind exception because the explanation for the fear expresses a *belief* different from the state of mind of being afraid.").

The majority contends that we made it clear in *Emmert* "that the bar applies only when the statements are offered to prove the truth of the facts underlying the memory or belief." Maj. Op. at 10. However, in *Emmert* and *Fontenot*, we did not indicate that our decisions hinged on the declarant offering the reasons for the belief in order to prove the events

believed.  Rather, our decisions identified the reason for the exclusion to be that the "testimony would have fallen within the 'belief category and would not have been limited to [the declarant's] current state of mind." *Emmert*, 829 F.2d at 810; *see also Fontenot*, 14 F.3d at 1371 (noting that "the statements would have demonstrated that [*Fontenot*] *believed* his and Cathy Fontenot's lives were in danger" (alterations in original)).

Here, Wagner intended to testify that Vogel was agitated, *because* he believed he was being raped and the officers were dressing him in pink underwear for a sex party.  This testimony was central to the Estate's theory of causation that Vogel's traumatic experience in jail caused his fatal arrhythmia several weeks later.  For these reasons, and in light of our case law, the district court's application of Rule 803(3) to the facts of this case was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record.  The district court did not abuse its discretion.

## C. Wagner's testimony lacked foundation

The majority also determines that the district court abused its discretion in concluding that Wagner lacked personal knowledge about Vogel's mental condition during the jailhouse dress-out procedure.  However, the majority again fails to give any deference to the district court's decision. Federal Rule of Evidence 602 provides that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has *personal knowledge of the matter*.  Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." (emphasis added).  The majority claims Wagner had adequate

foundation, because she had personal knowledge of her conversation with Vogel and perceived his emotions. The majority claims Vogel's statement's went to establish his state of mind at the time he spoke to his sister. Maj. Op. at 10. If Wagner's testimony were only offered to prove Vogel's temperament during his conversation with Wagner, the majority would be correct.

However, Wagner intended to offer various opinions regarding Vogel's state of mind *while in jail* and why he reacted the way he did *during the dress-out procedure*. For example, Wagner, testified that (1) Vogel "believed he was being raped," (2) Vogel "believed the pink underwear was used to put him in [a] vulnerable position," (3) Vogel hid under his bed to protect himself because he was "paranoid" and "felt he was in extreme harm's way," and (4) "this was very, I'm sure, frightening for him." The Estate's entire theory of liability turns on the purportedly indelible trauma Vogel endured during his stay at the county jail. Thus, there is no doubt that Wagner offered this testimony to prove what Vogel felt and believed while he was in jail—not how he felt as he described the jailhouse incident a week later. To be sure, the County objected to Wagner's testimony, not because Wagner failed to establish that she actually had a conversation with Vogel, but because Wagner lacked foundation to testify about the thoughts and beliefs of her floridly psychotic brother *during* the jailhouse incident. For these reasons, we cannot conclude that the district court abused its discretion in excluding this testimony, in part, because of lack of foundation. Its determination was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

## III.

## EXCLUDING REFERENCES TO PINK UNDERWEAR

The Estate failed to specifically and distinctly argue in its opening brief that the district court erred in excluding evidence related to pink underwear. Therefore, we should consider such an argument waived, and we should not address it. *See Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998). While the Estate mentions the issue in its statement of issues and summary of the argument sections of its opening brief, the Estate fails to discuss and argue the point in the body of the arguments section in the opening brief. Such a deficiency waives the issue. *See Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996) ("[A]n issue referred to in the appellant's statement of the case but not discussed in the body of the opening brief is deemed waived.").

I fail to understand why the majority addresses the issue. The sheriff's use of pink underwear is a policy consideration, with which we may disagree but should not review, especially when the issue is not properly before us. Sadly however, the majority's consideration of the issue is consistent with its failure to apply the appropriate standard of review (i.e., abuse of discretion) to the evidentiary issues discussed in other sections of this dissent.

## IV.

## EXPERT TESTIMONY

**A. The district court did not abuse its discretion by excluding Dr. Daniel Spitz's expert testimony**

Neither party disputed Dr. Spitz's preliminary conclusions that (1) Vogel's death was caused by acute cardiac arrhythmia, and (2) people with severe schizophrenia have an increased chance of dying from cardiac arrhythmia. The district court excluded Dr. Spitz's testimony, because there was no reliable scientific basis for his supplemental conclusion that Vogel's dress-out experience at the county jail caused his cardiac arrhythmia *three weeks later*. The majority concludes that the district court erred in excluding Dr. Daniel Spitz's testimony. I disagree.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, a court must determine whether an expert is "proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. 579, 592–93 (1993). This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. Among other things, a court should consider (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," and (4) whether it is generally accepted in the scientific community. *Id.* at 593–94. After examining Dr. Spitz's deposition testimony, the district court determined that the scientific theories underlying his

proposed testimony did not satisfy the standards in *Daubert*. The Estate failed to demonstrate that Dr. Spitz's three-week-later causation theory (1) could be or had been tested, (2) had been subjected to peer review or publication, or (3) was generally accepted in the scientific community. It was also unclear what evidence Dr. Spitz considered when forming his opinion and whether he considered all of the relevant evidence in the case.

In addition to the district court's findings above, Dr. Spitz admitted that he (1) did not interview any witnesses, (2) did not consult any relevant treatises or literature, and (3) only had experience investigating the deaths of possibly four or five schizophrenics where the cause of death was acute arrhythmia. Dr. Spitz also based his opinion, in part, on statements from Vogel's relatives (which the court deemed unreliable and inadmissible) and what he termed "common sense." Further, although Dr. Spitz testified that the dress-out procedure played a role in Vogel's death, he could not explain why other events—such as the car accident immediately preceding Vogel's death—had not caused acute arrhythmia earlier, explaining that "[w]hy [Vogel] died when he did is something probably nobody knows."**[2]**

---

**[2]** Other experts concurred in this assessment. For example, when asked about the possibility that the dress-out incident had some influence on the arrhythmia, Dr. Ira Ehrlich responded, "Anything is possible. Of course it's possible." When asked again whether Vogel may have been obsessing about the jail incident when he died, Dr. Ehrlich explained, "He could have. I would certainly not ever dismiss that as a possibility. I just don't see how anybody can point at that one incident and say that's what did it; in all likelihood, medical certainty, that's what did it. I think that's impossible." Dr. Ehrlich also expressed serious doubts about anyone's "ability to say, with any degree of certainty, what was going on in Mr. Vogel's brain at the time that he developed his fatal arrythmia[.] . . . Mr.

Plainly stated, Dr. Spitz's general qualifications as a medical examiner do not provide him license to speculate regarding the *environmental*—as distinct from the medical—factors that caused Vogel's death.  Dr. Spitz provided no scientific theory or method that could substantiate his purportedly "common sense" idea that the jailhouse dress-out procedure three weeks earlier was the cause of Vogel's heart arrhythmia.  Though Dr. Spitz could testify to the medical causes of Vogel's death, his speculation as to which of the many environmental stressors in Vogel's life "likely" or "probably" caused death did not meet *Daubert*'s threshold standard for scientifically valid reasoning or methodology.  Given the many glaring deficiencies in Dr. Spitz's proposed testimony, the district court's ruling cannot be an abuse of discretion.

**B.   The district court did not abuse its discretion by excluding portions of Dr. Phillip Esplin's expert testimony**

The majority concludes that the district court abused its discretion in excluding certain portions of the expert testimony of Dr. Phillip Esplin. The district court determined that Dr. Esplin's testimony was (1) "[un]supported by evidence;" (2) wholly "uncredible," because, by Dr. Esplin's own admission, no one can know what a floridly psychotic person was thinking; (3) lacking foundation; (4) "more prejudicial than probative;" and (5) going to "puzzle" the jury.  Given these deficiencies, I cannot say the district court's ruling was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

---

Vogel's brain is a salad bowl of stuff that has been tossed— unkindly perhaps, but—tossed so that there is no organization there whatsoever."

The majority's cursory treatment of the district court's ruling on Dr. Esplin's testimony never explains how the district court applied an erroneous legal standard or relied on a clearly erroneous finding of fact. No reliable evidence in the record—apart from Wagner's testimony—supported Dr. Esplin's claim that Vogel thought the pink coloring of the jail-issued underwear was significant. Dr. Esplin himself admitted that no one could know or understand what was going on inside the mind of a floridly psychotic schizophrenic, suggesting that, even with Wagner's testimony, his testimony on causation would be purely speculative. Given these foundation and methodological deficiencies, the district court acted within its discretion to exclude this testimony under Federal Rules of Evidence 702 and 703.

## V.

## CLOSING ARGUMENT

Lastly, the majority hastily concluded that the district court abused its discretion by denying the Estate a rebuttal closing argument at trial. However, the majority never explains what law gives a plaintiff in the District of Arizona an inalienable right to rebuttal argument, much less how the district court abused its discretion in shaping closing arguments under District of Arizona Local Rule 39.1(d). Rule 39.1(d) guarantees a "right to close" to the party bearing the burden of proof, but that rule has never been defined to provide the right to *speak last*. The district court permitted the Estate to make a "thorough," 60-minute closing argument. Following a short recess, the court explained to counsel that "[t]he closing is going to end with [the County]. There isn't going to be any rebuttal. I just did a little research, it's

discretionary.  [The Estate] had a thorough, complete effort at it, and [the County] is entitled to that as well.  But we're not going to have a rebuttal."  The court also noted, "I don't think there was anything that [the Estate] could have touched on that [the Estate] didn't explore, several times."

It is well established that a "trial court has broad discretion in controlling closing arguments." *United States v. Spillone*, 879 F.2d 514, 518 (9th Cir. 1989); *accord Fernandez v. Corporacion Insula De Seguros*, 79 F.3d 207, 209–10 (1st Cir. 1996) ("The decision to permit rebuttal [in a civil action] is a procedural matter which rests within the sound discretion of the trial judge and rarely (if ever) provides fertile ground for appeal." (internal citation omitted)).  Because the Estate closed with a 60-minute argument pursuant to Rule 39.1(d), the district court did not abuse its "broad" discretion in denying the Estate a rebuttal closing argument.

I would therefore affirm.